**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Henry Harold PARKER, Defendant-Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David Joe GREEN, Defendant-Appellant.**

**Nos. 72-1165, 72-1166.**

United States Court of Appeals,
Tenth Circuit.

Nov. 7, 1972.

Rehearings Denied Jan. 3, 1973.

James W. Bill Berry, Oklahoma City, Okl., for appellants.

William R. Burkett, U. S. Atty., Oklahoma City, Okl., for appellee.

* Honorable Stanley N. Barnes, Senior Circuit Judge of the Ninth Circuit, sitting by designation.

Before BARNES*, HILL and HOLLOWAY, Circuit Judges.

BARNES, Circuit Judge:

Before us are two consolidated appeals from conviction of a one-count indictment alleging a bizarre conspiracy "to defraud the United States of lawful revenue, that is, to make firearms, to-wit: destructive devices" without having paid the making tax, or having filed the written application, required by 26 U.S.C. §§ 5821 and 5861(f).[1]

The indictment then went on to charge:

> "It was part of said conspiracy that the defendants caused to be made two bombs consisting of dynamite, blasting caps and fuses, and two incendiary bombs to-wit: Molotov cocktails, consisting of bottled gasoline and rag wicks."

The government's theory was that the conspiracy to make the destructive devices was accomplished through the hiring by defendants of two convicted felons (Phipps and Bevill) who were incarcerated in the state penitentiary both at the time of trial and when they testified before the grand jury, and were granted immunity at the time they so testified. The government stipulated to these facts. (A. 56).

The term "firearm" as used in §§ 5821 and 5861(f) includes "a destructive device" (§ 5845(a)(8)). "A destructive device" is defined as "any explosive, (or) incendiary, . . . bomb, grenade, rocket . . . missile . . . mine, or similar device." (§ 5845(f)(1)). See: United States v. Melville, 309 F.Supp. 774 (S.D.N.Y. 1970); United States v. Davis, 313 F. Supp. 710, 713–714 (D.Conn.1970); United States v. Lauchli, 371 F.2d 303, 311–314 (7th Cir. 1966).

---

1. The period of the alleged conspiracy was from April 15, 1969, to April 16, 1970; thus occurring after the effective date of the revised § 5821 and § 5861(f), which was November 1, 1968.

Appellant charges seven errors, which we consider in turn.

## I

*The overruling of Defendants' Amended Motion for Production of Grand Jury Testimony.*

Appellants made (on August 17, 1971) prior to trial a motion (later amended) for the production of grand jury minutes and transcript, alleging "a particularized need"[2] to "impeach the witnesses before the Grand Jury, to refresh their recollection and to test their credibility."

The court found the grand jury minutes reflected only the indictments returned, and the number of jurors voting therefor. Only a part of the testimony was recorded, and only part of that transcribed. Under such circumstances, the court ordered the minutes of the grand jury to be shown, and copies of the defendants' own testimony furnished them under Rule 16(a) F.R.Cr.Proc.

The district court found no "particularized need" for the testimony of other witnesses, unless and until they had offered their testimony in court against defendants. This was based on the premise that prior to that time, there was no way to use such previous testimony to refresh recollection, impeach a witness, or test credibility. In so ruling, the district court followed *Dennis*[3] as suggested by the Tenth Circuit in Cargill v. United States, 381 F.2d 849, 851–852 (10th Cir. 1967), cert. denied 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968); Melton v. United States, 398 F.2d 321 (10th Cir. 1968); Hensley v. United States, 406 F.2d 481 (10th Cir. 1968); United States v. Hughes, 429 F.2d 1293 (10th Cir. 1970), as well as cases in other circuits. United States v. Johnson, 419 F.2d 56 (4th Cir. 1969), cert. denied 397 U.S. 1010, 90 S.Ct. 1235, 25 L.Ed.2d 423 (1970). In other words,

other than requiring that the transcript of the defendant's own testimony be delivered to the defendants prior to the trial, the court decided any other testimony was to be delivered in accordance with the usual Jencks Act rule during the trial.[4] The district court therefore denied defendant's motion, without prejudice to renewal thereof during the course of trial. (A. 28–29).

While it is true Rule 6(e) permits the court to disclose grand jury testimony preliminarily to a judicial proceeding it does not require it. This ruling was in accord with this circuit's understanding of *Dennis,* as stated and limited in *Cargill, supra.*

A motion to strike certain language from the indictment was granted in part, which left the description of the conspiracy as hereinabove quoted. An amended motion to furnish additional grand jury testimony was later made and overruled on the same grounds. Appellant's counsel asserts in his brief that these rulings resulted in his being given "some five, ten or fifteen minutes to review the testimony of two felons"; that this fact alone is a sufficient basis to establish the existence of the required "particularized need" on his part. This assertion is minimized rather effectively when the record discloses the trial judge stated to defendant's counsel, in denying the amended motion for the production of grand jury testimony:

> ". . . I will say this, that if it appears necessary in the furtherance of justice after they have testified, that the Court grant a continuance to give you adequate time to study such statements, I'll certainly do that. . . . " (A. 53).

Government counsel agreed to follow the court's suggestion, and did so. He gave defense counsel the Grand Jury testimony—and copies of two statements

---

2. *Cf.* Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959).

3. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

4. Demands for Production of Statements and Reports of Witnesses, 18 U.S.C. § 3500 (1957).

made by unindicted co-conspirator Phipps—before Phipps took the stand. (A. 157). Counsel for defendant asked for 20 minutes to read the statements, and received it. (A. 183). Government counsel likewise gave defense counsel the Grand Jury testimony of unindicted co-conspirator Fred Bevill, prior to Bevill's testifying; all pursuant to Jencks Act standards. (A. 236). During and after the testimony of both Phipps and Bevill, no further time to examine their Grand Jury testimony was requested by defendant's counsel. When the witness Henry testified, his Grand Jury testimony was not supplied to defense counsel by the government. Defense counsel then asked for and obtained a delay in the trial until it could be determined whether Mr. Henry's testimony before the Grand Jury had been transcribed. (A. 334). It had not. Continually during trial, defense counsel was asked by the trial judge if he desired additional time to familiarize himself with what the next prosecution witness would testify to, and never was a delay requested that was not granted.

■ The determination of whether "a particularized need" existed prior to the giving of testimony against an indicted defendant is peculiarly a matter resting in the sound judicial discretion of the trial court. It is not a matter of absolute right.

There existed here no lapse of time as existed in *Dennis* (events in 1948–55; Grand Jury testimony in 1956; trial testimony in 1963); little testimony as to acts of physical violence, which were not already corroborated by police and fire department records supplied to the defense. Thus, the "particularized need" was more readily apparent in *Dennis* than here. But more important, *Dennis* ultimately held only that petitioners "were entitled to examine the grand jury minutes relating to trial testimony of the four government witnesses, *and to do so while those witnesses*

*were available for cross-examination . . . .*" [Emphasis added.] 384 U.S. at 875, 86 S.Ct. at 1852.

■ Precisely the same opportunity was given to the defendants herein by the trial court's various rulings. *Cf.* United States v. Youngblood, 379 F.2d 365 (2d Cir. 1967). Under the Tenth Circuit cases mentioned above, we find no abuse of the trial court's discretion, and here we hold no prejudicial error existed with respect to the granting, or refusal to grant, disclosure of grand jury testimony.

## II and III

We consider next two alleged *errors; error in admission of testimony as to acts of defendants not set forth in the indictment and sought by a Bill of Particulars; and error in the introduction of inadmissible separate and independent crimes.*

■ The general rule in most jurisdictions, as well as in this Circuit, is that evidence of uncharged crimes, wrongs, or alleged prejudicial acts, is inadmissible. Equally clear is the existence of well recognized exceptions to this general rule.

Such evidence . . . "may be received for the purpose of proving a common plan, scheme or design to commit the offense charged or for the purpose of proving motive, opportunity, intent, knowledge, identity or absence of mistake, inadvertence or accident. . . . The rule and its exceptions have remained constant." United States v. Burkhart, 458 F.2d 201, 204 and 207 (10th Cir. 1972)[5] Here the trial judge permitted the introduction of evidence of other criminal acts under one or more exceptions to the general rule. He did not do this without some concern. (A. 70). But after careful consideration he permitted it.

■ It is certain that the judge made no errors as to the applicable law—the

5. For a thorough discussion of earlier Tenth Circuit cases on the subject, see *Burkhart,* *supra,* pp. 205–206; and more recent cases, pp. 206–207.

question before us is whether it can be fairly and honestly concluded that the evidence offered by the government tended to establish a common scheme, plan or system or design, and if so, whether that evidence "is so related to the crime charged that it serves to establish the crime charged *or to establish a motive, intent, or absence of mistake or accident as to the crime charged.*" Any such evidence must "have a real probative value, and not just a possible worth on issues of intent, motive, absence of mistake or accident, or to establish a scheme or plan." Morgan v. United States, 355 F.2d 43, 45 (10th Cir. 1966), cert. denied 384 U.S. 1025, 86 S. Ct. 1976, 16 L.Ed.2d 1029 (1966). [Emphasis added.]

■ If the defendants hired or caused the two felons to make the forbidden bombs and molotov cocktails—(as the jury found by its verdict)—evidence of their having caused other forbidden destructive devices to be made, without registering or paying the required taxes, and the use of them to "burn down" or "blow up" other buildings of defendants' competitors or enemies, would all be evidence of a common scheme or plan. And most assuredly, such evidence would be relevant and competent evidence to show an "absence of mistake or accident." Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); Jordan v. United States, 370 F. 2d 126 (10th Cir. 1966), cert. denied 386 U.S. 1033, 87 S.Ct. 1484, 18 L.Ed.2d 595 (1967); Baker v. United States, 329 F. 2d 786 (10th Cir. 1964), cert. denied 379 U.S. 853, 85 S.Ct. 101, 13 L.Ed.2d 56 (1964); Jones v. United States, 251 F. 2d 288 (10th Cir. 1958), cert. denied 356 U.S. 919, 78 S.Ct. 703, 2 L.Ed.2d 715 (1958); Young v. United States, 168 F. 2d 242 (10th Cir. 1948); Garhart v. United States, 157 F.2d 777 (10th Cir. 1947).

We turn to the delicate problem of balancing the scales. As Judge Seth aptly said in *Morgan,* after his language quoted above, concerning "a real probative value" and not just "a possible worth" :

"These are the key words which express the purpose for which an exception to the general exclusionary rule is applied under prior decisions. The words are however not without limit as to breadth and meaning. They must be and will be realistically and closely defined and limited. They cannot become an occasion or excuse or device for offering evidence of other crimes which have little or no real probative value or which is cumulative. This matter is obviously a most sensitive one for the accused and for the trial court. The risk and danger is great, and this must be recognized when considering the probative value of such evidence of specific acts offered to prove the crime charged."

■ Judge Doyle, in *Burkhart, supra* (which dealt with prior convictions for similar crimes), lists three factors which have contributed to the formulation of this cautious judicial attitude:

"First, the accused is required to defend charges which are not described in the information or indictment. As a result he is required to defend past actions which he may have in the past answered and with respect to which he may have even served his sentence. Thus, he is in effect tried as a recidivist though such a charge is not a part of the federal criminal code.

"Secondly, although such evidence may have at least some relevance to the offense being tried, its predominant quality is to show up the defendant's character as a car thief or a bad check artist, for example. Proof of defendant's sociopathic disposition is

not a valid object. Showing that a man is generally bad has never been under our system allowable. The defendant has a right to be tried on the truth of the specific charge contained in the indictment.

"Third, an obvious truth is that once prior convictions are introduced the trial is, for all practical purposes, completed and the guilty outcome follows as a mere formality. This is true regardless of the care and caution employed by the court in instructing the jury." 458 F.2d 204.

The first factor exists here. The defendants, by the introduction of the previous acts, were required to explain charges not described in the information or indictment. But the past actions here were not convictions, but alleged conduct or statements. They were not actions for which a defendant "[m]ay have in the past answered and with respect to which he may have even served his sentence." *Id.* Thus he is *not* here tried in effect as a recidivist for a crime for which he already served time.

Judge Doyle's second factor, "proof that a man is generally bad", remains always as a factor, once an uncomplimentary fact is charged. It exists here, but its weight and effect is dramatically reduced by reason of the witnesses' and defendants' character being otherwise established in the jury's mind, i.e., two of the witnesses admittedly were convicted felons, then serving sentences in a penitentiary.

The third factor, is that "once prior convictions are introduced the trial is, for all practical purposes, completed and the guilty outcome follows as a mere formality." There were here no prior con-

victions, and the premise of the third factor, if true, is no reason for abolishing all exceptions to the general rule, as the majority of jurisdictions in this country (including the Tenth Circuit) have declined to do. Nees v. Culbertson, 406 F.2d 621 (5th Cir. 1969), cert. denied, 395 U.S. 959, 89 S.Ct. 2098, 23 L.Ed.2d 745 (1969); United States v. Fisher, 377 F.2d 285 (6th Cir. 1967), cert. denied 389 U.S. 845, 88 S.Ct. 93, 19 L.Ed.2d 111 (1967); United States v. Dutsch, 357 F.2d 331 (4th Cir. 1966); Cantrell v. United States, 116 U.S.App.D.C. 311, 323 F.2d 613 (1963), cert. denied 376 U.S. 955, 84 S.Ct. 973, 11 L.Ed.2d 973 (1964); Tandberg-Hanssen v. United States, 284 F.2d 331 (10th Cir. 1960); Anthony v. United States, 256 F.2d 50 (9th Cir. 1958); United States v. Wall, 225 F.2d 905 (7th Cir. 1955), cert. denied 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 816 (1956).

Before coming to a conclusion on this issue, it becomes necessary to carefully and specifically examine what evidence was offered, what objections were made, the grounds stated therefor, how the trial judge ruled, what evidence went in, and how the judge instructed the jury with respect to these matters.

Appellant's brief lists the 12 alleged "incidents" claimed to have been erroneously permitted into evidence. (Brief, pp. 24–25). Appellee's Supplemental Memorandum lists what happened when these 12 alleged incidents were mentioned at trial. (Supp.Brief, p. 4).[6] We agree with the prosecution that the record discloses that as to five of the twelve incidents, no objection was made, and no motion to strike made after the testimony went in without objection. (Nos. 4, 5, 6, 9, and 12). As to these

---

6. As to four of six incidents to which objections were made (the nursing home fire, the damage to Mr. Tompkins' equipment, the Hallman Electric Co. fire and

something to do with equipment of the Blagg—shown as *Black* in the transcript —Construction Co.), the only objection was *surprise.*

incidents where no objections were made at trial, we find no error occurred, relying on the established rule in this circuit. Bond v. United States, 397 F.2d 162, 166 (10th Cir. 1968), cert. denied 393 U.S. 1035, 89 S.Ct. 652, 21 L.Ed.2d 579 (1969); Nutt v. United States, 335 F.2d 817, 819 (10th Cir. 1964), cert. denied 379 U.S. 909, 85 S.Ct. 203, 13 L. Ed.2d 180 (1964); Swift v. United States, 314 F.2d 860 (10th Cir. 1963); Sandoval v. United States, 285 F.2d 605 (10th Cir. 1960); Moreland v. United States, 270 F.2d 887 (10th Cir. 1959); O'Dell v. United States, 251 F.2d 704 (10th Cir. 1958).

■ As to No. 8 (putting Tompkins out of business), no objection appears when the question was asked (A. 176), but an objection was later made upon the sole ground that it was "incompetent, irrelevant and immaterial." This was not a valid objection (particularly in view of the defendants' expressed continuing objection as to incidents Nos. 1, 2, 3, and 7). The questions under the exception to the general rule, did have competence as evidence, and were relevant and material. We therefore hold no error existing in overruling the objection, on the basis of the following cases. Noonan v. Caledonia Gold Mining Co., 121 U.S. 393, 401, 7 S.Ct. 911, 30 L. Ed. 1061 (1887); Collins v. Streitz, 95 F.2d 430, 433 (9th Cir. 1938), cert. denied 305 U.S. 608, 59 S.Ct. 67, 83 L.Ed. 387 (1938); Pacific Alaska Airways v. Mahan, 89 F.2d 255, 256 (9th Cir. 1937), cert. denied 302 U.S. 700, 58 S.Ct. 19, 82 L.Ed. 541 (1937); Cook-O'Brien Const. Co. v. Crawford, 26 F.2d 574, 575 (9th Cir. 1928), cert. denied 278 U.S. 630, 49 S.Ct. 29, 73 L.Ed. 548 (1928).

When incident No. 7 was inquired into, no specific objection was made (A. 175, 283, 284), but apparently the government concedes that No. 7, with Nos. 1, 2, and 3, were incidents to which the defendants' continuing objection was made.

■ As to incident No. 10 (proposal by Parker to have Ronnie Hopgood "beat up") the prosecutor's question was objected to because "incompetent, irrelevant, and immaterial," and for no other reason. It was competent, relevant and material because of his (Green's) previous testimony describing Parker's pleasant and non-violent character, and the questions asked of Green by his own attorney on direct testimony.[7] We find no error as to the ruling on incident No. 10.

■ Incident No. 11 (proposal to shoot a policeman) related to a question asked by the prosecution of witness Bevill. It was objected to upon the ground that it "had nothing to do with the plan and scheme or otherwise." The court admitted it only for a specific purpose: to show "relationship, connection, and intercommunication as between the witness and the defendant." Thereafter objection was made (A. 248) as to events occurring but not set forth in the indictment (the "continuing" objection). Apparently, no ruling was actually made on this objection.

However, on cross-examination of Mr. Bevill, there was introduced into evidence by counsel for defendants Parker and Green three letters written from prison by Mr. Bevill to a Mr. R. W. Smith, a policeman with the Oklahoma

---

7. Direct examination of Mr. Green. (R.T. p. 502).

"Q. Do you know personally whether or not Henry Parker has ever killed anybody?
A. No, sir.
Q. Are you, personally, afraid of him?
A. No, sir, I am not."

We accept the foregoing quotation of counsel for the government as being from p. 502 of the Transcript, which is not part of the Appendix. The government asked the impeaching question here under attack properly and assumedly in good faith, in view of Green's prior inconsistent testimony before the Grand Jury. (Tr. p. 529).

City Police Department. In one, Mr. Bevill states, speaking of Mr. Parker, "He is a dangerous man. He once offered us $1,500 to shoot a policeman there." (A. 271). In view of the testimony offered by the defense, we find no error in the examination of witness Bevill on the same subject matter.

 There remains for consideration, then, incidents Nos. 1, 2, 3 and 7, and the continuing objection permitted thereto. This objection was based on the fact that because defendants were not advised prior to trial that questions would be asked about those incidents, and they not being a part of the crime or overt acts charged, the defendants were "prejudicially surprised."

The short answer is that defendants' Amendment to Motion for Bill of Particulars was addressed only to seeking "additional acts or omissions . . . *which the government intends to prove as a part of the conspiracy,*" i.e., any other matters which constitute the conspiracy charged. On the hearing of said motion, the government agreed to tell defendants' counsel "precisely, which fires and which bombs we are talking about, which would prove the conspiracy."

The government then furnished the defendants details of the four incidents described in the indictment—the four incidents in which "destructive devices" were allegedly used.

Testimony of other similar incidents (two fires and two destructions of equipment) were then offered by the government not to prove the conspiracy charged, but to prove similar acts. The two acts of starting fires were certainly similar acts, both generally and specifically. There was no "time-lag" as there was in *Burkhart, supra.* The conspiracy allegedly took place between April 15, 1969, and April 16, 1970. The nursing home fire occurred on April 2, 1969; the Hallman Electric Co. fire was during April, 1970; the damage to Tompkins construction equipment was in "the summer of '69;" the damage to the Black (Blagg) Construction Co. property was in 1970.

Two of the acts involved the property of Tompkins, Parker's competitor. The other two involved the property of a man to whom Parker had lost a law-suit, who was likewise a competitor.

Thus these four other incidents, or criminal acts about which witnesses were questioned, were not too remote in subject matter, or point of time. They were not the "remote and unconnected offenses" involved in *Burkhart.* They were not inadmissible under the similar offenses doctrine—a juror's mind could fairly and rationally perceive that the commission of the acts not charged as a part of the conspiracy but as similar acts, tend, "by a visible connection," to prove the commission of the acts charged. (*Burkhart, supra,* n. 8). We hold this case is not controlled by the majority opinion in *Burkhart, supra,* and that the admission of evidence in this case of specific similar acts tended to establish a common scheme, plan, system, or design; and was so related to the crime charged that it served to establish a motive or intent, and an absence of mistake or accident; that such evidence had real probative value, and was admissible. Morgan v. United States, *supra.*[8]

---

8. In asserting "prejudicial variance" defendants rely heavily on Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). In it the defendant was indicted for interfering with interstate commerce by extortion, with respect to the importation *into* Pennsylvania of *sand* for use in building a ready mixed concrete steel plant. Evidence was permitted to go to the jury to show the defendant had interfered with the exportation *from* Pennsylvania of *steel* to be

One other matter is worthy of notice. This was a conspiracy case (18 U.S.C. § 371). In conspiracy prosecutions "[T]he government has considerable leeway in offering evidence of other offenses in conspiracy prosecutions." 3 L. Orfield, Criminal Procedure Under the Federal Rules, § 26.506 (1966); United States v. Bonanno, 467 F.2d 14 (9th Cir. 1972); United States v. DeSapio, 435 F.2d 272, 280 (2d Cir. 1970), cert. denied 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); United States v. Jones, 425 F.2d 1048, 1054 (9th Cir. 1970), cert. denied 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970); Hanger v. United States, 398 F.2d 91 (8th Cir. 1968), cert. denied 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969); Egan v. United States, 137 F.2d 369, 382 (8th Cir. 1943), cert. denied 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474 (1943). *Hanger, supra,* cites with approval a Tenth Circuit non-conspiracy case, Welch v. United States, 371 F.2d 287, 293–294 (1966), cert. denied 385 U.S. 957, 87 S.Ct. 395, 17 L.Ed.2d 303 (1966). (Welch was a tax evasion case.) The Circuit Court held the trial court did not abuse its discretion in allowing admission of evidence tending to show defendant guilty of immorality, "which evidence centered on defendant's expenditures in support of his extramarital experiences", as quoted in *Hanger, supra,* 398 F.2d at 102.

One further matter is important where this type of evidence is offered: the strength of the government's case. In view of the testimony of Phipps and Bevill, plus the corroborating testimony of Jimmie Lee Harris and B. Jack Henry, we hold the evidence relating to other acts of violence or threatened violence could not have been as prejudicial as it might in other weaker cases. United States v. Masters, 450 F.2d 866, 868 (9th Cir. 1971), cert. denied 405 U.S. 1044, 92 S.Ct. 1329, 31 L.Ed.2d 587 (1972).

As to instructions given or refused by the trial judge either during the trial or before the jury's deliberations (which related to evidence of previous acts of violence), no issue has been made as to the instructions given or refused in this area, and we can only presume the judge correctly instructed the jury in all necessary details. Thus, on this issue we hold no error occurred.

IV

The appellant urges that his motion to strike surplusage, partially granted, should have been granted in a larger measure. At the time the motion was heard, after the motion to strike was partially granted, and the court read this part to be stricken, counsel for defendants apparently agreed with this ruling. ("All right, sir." (A. 64)).

No prejudice beyond that created by reason of any indictment for an alleged criminal act existed here. To make the appellants' co-conspirators it was necessary to charge them with "causing to be made two bombs". That one person does not physically do all the acts constituting the conspiracy does not mean he may not be charged with participating in it. "Causing the bombs to be made" was one of the acts charged against appellants. This is prejudicial just as a charge of having committed any criminal act is prejudicial, and no more. But it is not error.

V

The giving of Instruction No. 12 was proper. It read in its third

manufactured. The jury was instructed Defendant Stirone could be guilty of either act. This permitted the jury to convict the defendant of a crime he had never been charged with; which had never been presented to any grand jury; which was a different crime; and which occurred at a different period of time. Held: *error*, requiring reversal. Those are not the facts here.

paragraph: "The law presumes that every person who has reached the age of discretion be accountable for all of his acts. The law also presumes that every sane person contemplates and intends the necessary and natural consequences of his own acts." But these two sentences did not stand alone; they were given, as defendants state, "along with a charge which sets forth specific intent as an essential element in the proof of conspiracy."

The entire instruction No. 12 appears at page 47 of the Appendix. In two paragraphs preceding the one sentence here criticized, the jury was instructed:

"You are instructed that an intent to commit the crime set forth in the indictment by the defendants now on trial is an essential element of the crime charged, and the burden is upon the Government to establish such intent to your satisfaction beyond a reasonable doubt.

"In this connection, you are instructed that the intent with which an act is done, is a mental state of the mind of the accused. Direct and positive proof of intent is not necessary, but the same may be and usually is proved by circumstantial evidence. If you find that an act was done, the intent with which it was done is to be determined by you from all the facts and circumstances as shown by the evidence presented in this case."

Other references to the required "wilfulness" of the acts charged appear in Instructions Nos. 5 and 6.

We think the language of this court's decision in McCarty v. United States, 409 F.2d 793 (10th Cir. 1969), cert. denied 396 U.S. 836, 90 S.Ct. 95, 24 L.Ed.2d 87 (1969) is controlling.

"Such a charge standing alone has been criticized (citing cases) not without some justification as confus-

ing, clumsy, or unnecessary, if not prejudicial, in other cases held to constitute reversible error (citing cases, which include Bloch v. United States, 221 F.2d 786 (9th Cir. 1955), cited in defendants' brief and quoted from extensively beginning at Page 47) and in another case deemed plain error. When taken in context with an entire charge, however, most courts (citing cases), including this one (citing United States v. Tijerna, 407 F.2d 349 (10th Cir. 1969); Elbel v. United States, 364 F.2d 127 (10th Cir. 1966); Roper v. United States, 54 F.2d 845 (10th Cir. 1931); and Laws v. United States, 66 F.2d 870 (10th Cir. 1933), which have considered the question, have accepted its principle as involving a mere rule of circumstantial evidence not inconsistent with the burden of the government and the doctrine of reasonable doubt, or at worst, as not constituting prejudicial error considering the instructions as a whole."

 Appellants rely heavily on Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). This reliance is misplaced. Defendants assume that because they defended on a claim they did not know what Phipps and Bevill were doing, Phipps and Bevill alone were subject to the taxing statute. But there is sufficient evidence in the record to establish that defendants knew that Phipps and Bevill were manufacturing the devices, and that the defendants employed Phipps and Bevill to do just that. They were employers of Phipps and Bevill, and the employers were the ones whose convictions were affirmed in *Ingram,* while the employees were not held.

Appellants urge:

"The prosecution has failed to offer proof that the defendants had any knowledge that Phipps and Bevill were using Molotov cocktails or bombs."

The government replies by quoting:

(1) (A. 173) Phipps—(testifying):

"Q. Did you discuss with Mr. Parker the use of dynamite on that building?

A. Well, I discussed it with Mr. Parker, but that decision was left up to me, whether I wanted to use dynamite or burn it . . . as long as I done the job."

(2) (Tr. 290—omitted from Appendix) Harris—(testifying):

"Q. David, did you ever discuss the acquiring of dynamite with David Joe Green?

A. I had a discussion with him once and he asked me if I knew where I could get it and that if I couldn't get it, he could."

We might also add:

(3) (A. 283). Witness Harris testified Green said (after a discussion with Mr. Parker who was "mad" at Mr. Hallman) Parker wanted to find Phipps—"the boy that had done the bombings for him before."

(4) (A. 281 Paragraph 5)

Other conversations between Green and Harris took place with respect to burning houses; and money paid by Parker to Phipps for that purpose. Harris overheard conversations between Parker and Green wherein Parker "wanted the pre-release center bombed." "Q. Bombed? A. Bombed or blowed up." (A. 286–288).

We conclude appellants have misstated the evidence as to defendants' lack of knowledge as to Phipps and Bevill's activities.

## VI

Appellant's Proposition VI is a restatement of errors previously urged and discussed, with particular emphasis on Instruction No. 16–B. Appellants cite no case law in support of their objection to it. Appellees cite authority that it is good law in the Fifth Circuit. We find no prejudicial error. United States v. Ayres, 434 F.2d 60, 61 (5th Cir. 1970), cert. denied Sidney v. United States, 401 U.S. 938, 91 S.Ct. 930, 28 L. Ed.2d 217 (1971); Reese v. United States, 353 F.2d 732–734 (5th Cir. 1965); Kolbrenner v. United States, 11 F.2d 754, 756 (5th Cir. 1926), cert. denied 271 U.S. 677, 46 S.Ct. 489, 70 L.Ed. 1146 (1926). *Accord,* United States v. Nowak, 448 F.2d 134, 140 (7th Cir. 1971), cert. denied 404 U.S. 1039, 92 S. Ct. 714, 30 L.Ed.2d 731 (1972).

## VII

 The prosecution offered a box of debris and a bottle into evidence. The court declined to admit these into evidence, though they had been marked previously Exhibits 1 and 2, for Identification only. They remained in the courtroom as was required; and possibly within sight and sound of the jury —which was not required. They were later shown to several witnesses, including Donald A. Flynt, the prosecution's expert witness on explosives. *Without objection from the defense,* this witness was allowed to testify he had chemically tested the debris, and allowed to give his expert opinion that he found the presence of "ammonia, nitrates and sulfates in the residue contained in the box," and that it was "my opinion some type of explosive was detonated." (A. 155, lines 1 to 21).

Counsel for defendants cannot urge error in admitting the debris into evidence, for it was not—his objection kept it out. He cannot, *now,* object to the expert testimony, because no objection was made at the time of trial. See *Bond, supra,* and other Tenth Circuit cases cited there. Counsel for defendants then states: "The Court gave the defendants

a continuing objection *to any further reference* to the exhibits." (A. 114). (Emphasis added.) The record does not bear out this flat assertion.[9]

The Court then said, again out of the hearing of the jury:

"THE COURT: The defendant, through counsel, requested me a minute ago after we broke up that the record show his continuing objection to these exhibits even being placed before the jury, even though they are not going to be received, and he will have that continuing objection.

"MR. BERRY: All right."

Thus the defense's *continuing objection* went only to permitting the Exhibits marked for identification to be kept in the courtroom in view of the jury. His objection did not go, nor was any objection made or preserved to the *testimony* of Hill (A. 115); Rodgers (A. 117); Connelly (A. 118); Rucker (A. 135); and Flynt (A. 154) concerning the debris and bottle. (Exhibits for Identification 1 and 2).

Counsel for defendants objects *now* to the expert testimony of witness Flynt, alone. He made no objection to it at the trial. (A. 155). He made no objection at the trial, or now, to similar expert testimony given by the witness Rucker (A. 135, 137), apparently because defendants' previous counsel had received copies of the chemist's report (Plaintiff's Exhibit 11) on the previous October 29th, long before trial.

9. The objection made by counsel for defendants was not an objection based upon legal grounds (A. 102), but upon the ground a pretrial order had been made, based on a stipulation, that the government would "exhibit all exhibits to me within a reasonable time prior to trial" (A. 102), but that the government had not exhibited this debris to him prior to trial. Government counsel explained he had never seen the debris (which had been kept in the custody of the police department) until it was delivered to him "last Friday"—(we assume the Friday before the trial started). Outside the presence of the jury, government counsel stated he was willing not to offer the

*Under the circumstances of this case* we find no error in the trial court permitting the debris to remain in the courtroom, in view of the restricted ruling the trial judge made on defendant's restricted objection to its presence.

But even if error existed in leaving the debris in the courtroom after it was marked for identification, we can find no prejudice caused to the defendants. We rule it harmless error, if any.

The conviction of each defendant is affirmed.

debris in evidence but wanted "to have [those] witnesses testify to it, because I want to bring out the chemist's analysis that shows that it was a result of an explosion." (A. 107). The court indicated he thought that could be done (A. 107), and so ordered. (A. 109). Counsel for defendants agreed "[t]hat *the chemist is entitled to testify as to what was brought before him and what was analyzed by him and what the results of that analysis were.*" (A. 107, lines 8–11).

Both counsel had agreed that "an explosion took place where the debris came from." (A. 108).