**UNITED STATES of America,
Plaintiff–Appellant and
Cross–Appellee,**

v.

**Jessie Ervin BUCHANAN,
Defendant–Appellee and
Cross–Appellant.**

**Nos. 88–2709, 88–2791.**

United States Court of Appeals,
Tenth Circuit.

Dec. 12, 1989.

Paul G. Hess, Asst. U.S. Atty. (Roger Hilfiger, U.S. Atty., on the brief), Muskogee, Okl., for plaintiff-appellant and cross-appellee.

David Booth, Federal Public Defender, Muskogee, Okl., for defendant-appellee and cross-appellant.

Before BALDOCK, McWILLIAMS and EBEL, Circuit Judges.

BALDOCK, Circuit Judge.

Petitioner-appellee and cross-appellant, Jessie Ervin Buchanan (Buchanan), was charged with the manufacture and possession of an unregistered firearm, 26 U.S.C. § 5861(d) & (f), and conspiracy to commit these offenses, 18 U.S.C. § 371. His first trial produced a hung jury. His second trial resulted in a conviction which was affirmed on direct appeal in *United States v. Buchanan*, 787 F.2d 477 (10th Cir.1986). We affirmed in part, reversed in part and remanded the case after the denial of Buchanan's subsequent petition for modification of sentence in *United States v. Buchanan*, 830 F.2d 146 (10th Cir.1987).

Buchanan sought collateral relief under 28 U.S.C. § 2255, alleging that the government's failure to disclose a personal relationship between its Bureau of Alcohol, Tobacco and Firearms (BATF) investigator and Buchanan's former wife violated *Bra-*

*dy v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court agreed and granted Buchanan a new trial. The United States now appeals. Buchanan cross-appeals, arguing that the district court erred in granting him a new trial instead of setting aside his conviction. Our jurisdiction arises under 28 U.S.C. §§ 2253 & 2255. Because we find that the undisclosed evidence is not material to Buchanan's guilt or punishment, we reverse.

## I.

### A.

Joann Huffman is the mother of Gwen Whitten, Buchanan's former wife. On September 3, 1982, Huffman's trailer home was destroyed by a fire resulting from a gasoline firebomb. John Omstead confessed to the bombing, while being held on an unrelated charge. The government subsequently charged Buchanan with hiring Omstead and Eric Elrod to burn the trailer.

Prior to trial, Buchanan's counsel filed an extensive discovery motion seeking exculpatory and other evidence. Paragraph VIII of the motion sought "any evidence which might be used for impeachment of any witness for the prosecution at the time of trial," specifying four distinct sources of inquiry.[1] The court subsequently ordered the government to disclose all material "which may be used to impeach *substantially* the credibility of *key* government witnesses." *United States v. Buchanan,* No. 84-4-CR, order at 5 (E.D.Okla. Feb. 1, 1984) (emphasis in original).

At trial, Gwen Whitten testified that a rancorous relationship existed between Buchanan and her mother. Tr. 72-73.[2] She

stated that Buchanan threatened Huffman on several occasions: "[H]e threatened my mother to me at one time. We were in an argument and he told me, he said, 'Gwen I love you and I'm going to get you through someone you love.'" Tr. 66. Huffman's testimony corroborated the antipathy between Buchanan and herself. She testified that Buchanan made a threat directly to her: "[H]e took some money out of his pocket, I don't know how much, he had a roll of money, and he said, 'I've got you right here.'" Tr. 90.

The government's principal witness was Eric Elrod. Elrod testified that on the evening of September 1, 1982, he was sitting in his truck with John Omstead and Kathy Bunch when Buchanan motioned Elrod to Buchanan's car. Tr. 126. While Omstead and Bunch waited in Elrod's truck, Elrod walked to Buchanan's car, whereupon Buchanan offered him $800 to burn Huffman's trailer. Tr. 128. According to Elrod, Buchanan paid him $400 that night, Tr. 131, and told him to collect the balance at the Tri-a-Nite lounge when the job was completed. Elrod explained:

> [Buchanan] wanted to establish his alibi there. He told me that he will be there and have plenty of people around him. He told me when ... I go in there, he'll go to the bathroom, you know, he didn't want me to follow him right away, he just, you know, go ahead and order me a beer, he told me, and wait. And he went in the bathroom and told me to follow him in there an he would pay me the rest of the money there.

Tr. 130. Elrod met Buchanan the following evening and the two confirmed this plan. Tr. 143.

---

**1.** With respect to impeachment evidence, Buchanan's discovery motion sought the following:

> VIII.
>
> THE DEFENDANT moves this honorable Court to order the United States of America to furnish to the Defendant *any evidence which might be used for impeachment of any witness for the prosecution at the time of trial, including, but not limited to,* (1) the prior grand jury testimony of any witness to be called at trial; (2) the prior statements of any witness to be called at trial; (3) any agreements, negotiations, or offers made by the United States to

any witness in order to secure his or her testimony; (4) any other form of inducement used by the United States to secure a witness's testimony at trial, or such other evidence which might reasonably effect a determination of guilt or innocence or would tend to mitigate punishment of the Defendant, if any. Defendant's Omnibus Motion to Produce at 5, *United States v. Buchanan,* No 84-4-CR (E.D. Okla., filed Jan. 20, 1984) (emphasis supplied).

**2.** The transcript cited in this section is that from Buchanan's second trial held February 27, March 1, 2 & 5, 1984.

Elrod testified that the next day he and Omstead constructed a firebomb out of a plastic milk jug filled with gasoline and charcoal fluid. Tr. 148–49. They drove to Huffman's trailer, made sure no one was inside, and then tossed the lighted bomb through the bedroom window. Tr. 152–54. After leaving the burning trailer, Elrod and Omstead drove to the Tri-a-Nite lounge:

PROSECUTOR: Did you see Jessie Buchanan [there]?

ELROD: Yes.

PROSECUTOR: Where was he?

ELROD: He was sitting ... with a crowd of people to my right.

. . . . .

PROSECUTOR: And whenever you saw Jessie Buchanan over there, did you make any comments or gestures to him, or did he to you?

ELROD: No, I didn't say nothing to him, that was part of the deal. I looked at him ... and he looked at me and kind of nodded at him and he knew.

PROSECUTOR: All right. And then what happened next?

ELROD: He got up and went to the bathroom.

PROSECUTOR: Is that what he was supposed to do?

ELROD: Yes.

PROSECUTOR: And then what happened ...?

ELROD: I sat there and drank a couple more drinks of my beer, and then I went in there after him.

PROSECUTOR: And when you got to the bathroom what happened ...?

ELROD: Well, there was another person in there, you know, using the bathroom. He walked out, and [Buchanan] paid me the rest of my money and walked out.

Tr. 156–57.

Elrod testified that the following day he and Omstead went to Buchanan's home, informed Buchanan that Huffman's son was expected in town and asked for more money to get away from him. Buchanan complimented the pair on their "good job," gave Elrod an additional $200 and told the pair to go camping. Tr. 160. On cross-examination, defense counsel elicited that Elrod was testifying pursuant to a plea agreement, had lied to BATF investigators about his involvement in the burning and had been convicted of a felony on three prior occasions. Tr. 168–170 172, 191, 199.

Omstead's testimony corroborated Elrod's story in most respects. *See* tr. 234, 236, 238, 241, 243. However, Omstead never dealt directly with Buchanan, but indirectly through Elrod. Tr. 257. Omstead was cross-examined concerning his plea agreement, drug use, and prior inconsistent statements. Tr. 264–65, 273–74. Kathy Bunch testified that she had remained in the car with Omstead when Elrod spoke to Buchanan on the night of September 1, 1982. Bunch testified that when Elrod returned to his truck he "said something like flick of a light switch and then blow something." Tr. 319.

BATF Agent Doye A. Tilley testified as an expert in firearms. Tr. 354. He stated that the firebomb Elrod and Omstead constructed was a firearm under federal law for which Buchanan had no registration. Tr. 344–45. Tilley sat with the government prosecutors throughout the trial. Tr. 534.

In his defense, Buchanan produced three witnesses each of whom testified that they did not see Elrod and Omstead at the Tri-a-Nite lounge on the evening of the fire. Buchanan also testified in his own defense, denying any involvement in the bombing.

**B.**

The § 2255 hearing revealed that agent Tilley and Gwen Whitten met before Buchanan's first trial, when Tilley was investigating the fire at Huffman's trailer. Tr. 10.[3] Tilley obtained one statement from Whitten and reduced it to writing. Tr. 70–71. Despite the fact that Whitten "did not know anything about the fire," tr. 70,

---

**3.** The transcript cited in this section is that from Buchanan's § 2255 hearing held December 8, 1987.

Tilley continued to meet with Whitten on a personal basis and the pair soon became "friends." Tr. 72, 32. Between Buchanan's first and second trial, Tilley and Whitten continued their friendship, meeting occasionally. Tr. 12–13. Subsequent to Buchanan's conviction in March, 1984, the pair continued to socialize and dine together. Tr. 91. Including telephone calls, Tilley acknowledged speaking with Whitten approximately a hundred times between 1983 and 1985. Tr. 121–22.

On June 1, 1985, Whitten gave birth to a girl named Angela Nicole Tilley. Tr. 13–14. On June 6, pursuant to Whitten's request, Tilley signed a sworn affidavit acknowledging paternity of the child. Tr. 92. Whitten testified, however, that Tilley was not the father and claimed that she had lied on the birth certificate. Tr. 35–36. Tilley testified that he did not know who the baby's father was. Tr. 120.

After hearing this testimony, the district court held that the undisclosed information concerning the Tilley–Whitten relationship raised a "reasonable probability" that Buchanan's conviction "may not have occurred." *Buchanan v. United States*, No. 87–50–C, order at 2, (E.D.Okla. Sept. 30, 1988). The court therefore held that the government's failure to disclose this relationship to Buchanan violated the *Brady* rule and entitled Buchanan to a new trial.

## II.

■ We review the factual findings of a district court acting pursuant to 28 U.S.C. § 2255 under the clearly erroneous standard. *United States v. Owens*, 882 F.2d 1493, 1501–02 n. 16 (10th Cir.1989). However, the materiality of withheld evidence under *Brady* and its possible effect on the verdict are mixed questions of fact and law reviewed *de novo*. *Bowen v. Maynard*, 799 F.2d 593, 610 (10th Cir.), *cert. denied*, 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986). We therefore review *de novo* the district court's holding that the government's failure to disclose the Tilley–Whitten relationship violated *Brady*.

To assess Buchanan's claim that the government's failure to disclose the Tilley–

Whitten relationship violated *Brady*, our inquiry begins at the source. In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Brady and his companion were separately charged with murder committed in the perpetration of a robbery. Under state law, punishment for that crime was life imprisonment or death, the jury being empowered to restrict punishment to life. Prior to trial, defense counsel requested extrajudicial statements by the companion. However, the prosecution withheld statements in which Brady's companion confessed to the actual homicide. Brady did not contest the charge of first-degree murder, but rather denied committing the actual homicide and, on that basis, asked that he not be executed. The jury found Brady guilty and declined to spare him from the death penalty.

The Supreme Court overturned Brady's death sentence, holding that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. This oft-quoted language established the prosecutor's broad duty to disclose exculpatory material to the defense; the limitations of this holding are found in the Supreme Court's discussion of Brady's relief.

Brady had sought an entirely new trial in which the suppressed evidence would be introduced to contest his guilt. However, the Court concluded that, under state law, the suppressed confession could not reduce Brady's culpability below first degree murder. The Court acknowledged that introducing the suppressed confession in a new trial might have led, through jury nullification of the court's instructions, to Brady's acquittal on the first degree murder charge. However, by obliging prosecutors to disclose exculpatory information, the Court sought to protect the constitutional rights of the accused, not arm defense counsel with the tools to elicit a jury verdict based on emotion:

A sporting theory of justice might assume that if the suppressed confession

had been used at the first trial, the judge's ruling that it was not admissible on the issue of innocence or guilt might have been flouted by the jury just as might have been done if the court had first admitted a confession and then stricken it from the record. But we cannot raise that trail strategy to the dignity of a constitutional right and say that the deprival of this defendant of that sporting chance ... denies him due process....

*Id.* at 90–91, 83 S.Ct. at 1198–99. (footnote omitted). Because punishment was the only issue on which the suppressed confession was material, the Court restricted Brady's relief to retrial on punishment.

"A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976). A prosecutor therefore is "not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3379–80, 87 L.Ed.2d 481 (1985). " 'For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose....' " *Id.* (quoting *Agurs,* 427 U.S. at 108, 96 S.Ct. at 2399).

■ The standard of materiality required to set aside a criminal conviction on *Brady* grounds varies with the specificity of the defendant's request and the conduct of the prosecutor. In *Agurs,* the Supreme Court enunciated three different standards of materiality based upon these factors. 427 U.S. at 103–07, 96 S.Ct. at 2397–99. The first situation involves the prosecutor's knowing use of perjured testimony. A conviction obtained through such testimony is fundamentally unfair and must be set aside if there is "any reasonable likelihood that the false testimony could have affected"

the verdict. *Id.* at 103, 96 S.Ct. at 2397. A *Brady* violation in this context is deemed material unless determined harmless beyond a reasonable doubt. *Bagley,* 473 U.S. at 679–80, 105 S.Ct. at 3382.

■ The second situation is characterized by a defendant's pretrial request for specific evidence and the prosecutor's failure to disclose responsive evidence. *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397–98. In that case, a *Brady* violation is established upon a showing that the undisclosed evidence " 'might have affected the outcome of the trial.' " *United States v. Warhop,* 732 F.2d 775, 778 (10th Cir.1984) (quoting *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397). Under this standard, a new trial is required " 'if there was a "reasonable possibility" that the undisclosed evidence would have materially affected the verdict.' " *Warhop,* 732 F.2d at 778 (quoting *Chavis v. North Carolina,* 637 F.2d 213, 223 (4th Cir.1980)).

■ The third situation arises when the exculpatory information in the possession of the prosecutor may be unknown to the defense and the defendant either makes no request or else asks for " 'all Brady material' " or " 'anything exculpatory.' " *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399. Such requests provide the prosecutor with no better notice than if no request was made; the duty to respond derives from the obviously exculpatory nature of the evidence in the hands of the prosecutor. *Id.* at 106–07, 96 S.Ct. at 2398–99. In this situation, the reviewing court must look to the whole record and determine whether "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2401–02.

> If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Id.* at 112–13, 96 S.Ct. at 2401–02.

### III.

■ Buchanan does not allege that the government aided in the presentation of

perjured testimony by either Tilley or Whitten. Hence, we need not proceed under a harmless error analysis. *See Bagley,* 473 U.S. at 679–80, 105 S.Ct. at 3382. A closer question, however, is whether Buchanan's request for "any evidence which would tend to impeach the testimony of a government witness," *supra* note 1, is a general or specific request under *Agurs.* In *Bagley,* the Supreme Court held that defendant's request for " 'any deals, promises or inducements made to witnesses in exchange for their testimony' " was specific under *Agurs. Bagley,* 473 U.S. at 669–70, 683–84, 105 S.Ct. at 3383, 3384–85. Similarly, in *Warhop,* we held that a request for " '[a]ny FBI interview statements ...,' which tend to exculpate the Defendant and impeach the testimony of Government witnesses' " was specific. 732 F.2d at 778. What unites these two cases is defense counsel's focus on tangible and identifiable sources of information. Based upon the notice contained in these requests, the prosecutor could focus her inquiry on distinct sources of information, conduct a search and meet her obligation under *Brady* either by turning over exculpatory evidence or notifying opposing counsel that no such evidence existed.

In this case, Buchanan sought "any evidence" of impeachment "including but not limited to" four tangible sources of information. Evidence of the Tilley–Whitten relationship was not contained within any of the four tangible sources; hence it falls into the default language of the request. To the extent that Buchanan's motion for impeachment evidence specified tangible sources of inquiry, it provided the prosecution with notice of where to locate such evidence. However, the default language "not limited to" provided no better notice than if no request had been made. *See Agurs,* 427 U.S. at 106–07, 96 S.Ct. at 2398–99. With respect to evidence of the Tilley–Whitten relationship, Buchanan's request for impeachment evidence concerning government witnesses therefore was general under *Agurs.* The district court consequently erred in applying the "reasonable probability" standard of materiality. Rather, Buchanan's claim must be reviewed to determine whether evidence of the Tilley–Whitten relationship, when viewed in context of the entire record, creates a reasonable doubt as to Buchanan's guilt that did not otherwise exist. *See id.* at 112, 96 S.Ct. at 2401–02.

## IV.

■ Before addressing the materiality of the Tilley–Whitten relationship, we first must determine whether Tilley's knowledge of this relationship can be imputed to the prosecution. This step is necessary because there is no indication that government prosecutors knew of the relationship between Tilley and Whitten.

■ The good faith or bad faith of the prosecutor has no bearing on the due process inquiry required by *Brady. Brady,* 373 U.S. at 87, 83 S.Ct. at 1197. Accordingly, "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). " 'Since ... investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutors, were guilty of nondisclosure.' " *United States v. Endicott,* 869 F.2d 452, 455 (9th Cir.1989) (quoting *United States v. Butler,* 567 F.2d 885, 891 (9th Cir.1978)). Knowledge by police or investigators is therefore imputed to the prosecution under *Brady. See, e.g., Endicott,* 869 F.2d at 456 (BATF agent's knowledge of possibly exculpatory evidence attributed to prosecutor); *United States ex rel. Smith v. Fairman,* 769 F.2d 386, 391–92 (7th Cir.1985) (police officer's knowledge of ballistic test results attributed to prosecution); *Schneider v. Estelle,* 552 F.2d 593, 595 (5th Cir.1977) (state law enforcement officer is part of prosecution team, his knowledge is imputed to the prosecutor under *Brady* ).

Here, agent Tilley worked in close proximity with the prosecution in the preparation of the government's case against Buchanan. Tilley certainly knew of his rela-

tionship with Whitten. Accordingly, his knowledge is imputed to the government, regardless of the prosecutor's apparent lack of knowledge.

## V.

■ The government contends that impeachment evidence is not cognizable as exculpatory evidence under *Brady*. Thus, the government contends that evidence of Agent Tilley's relationship with Buchanan's former wife does not fall under the *Brady* rule requiring disclosure. We disagree.

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perception and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness.

*Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). A vital means of impeaching a witness is revealing possible biases, prejudices or ulterior motives of the witness relating to the personalities at trial. *Id.* For that reason, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17, 94 S.Ct. at 1110–11. Thus, because impeachment is integral to a defendant's constitutional right to cross-examination, there exists no pat distinction between impeachment and exculpatory evidence under *Brady*. *Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380. Rather, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady* ] rule." *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766 (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)).

■ *Brady* does not "automatically require a new trial 'whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict[.]' " *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766 (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir.1968)). Only where a witness' credibility is material to the question of guilt does the prosecutor's failure to disclose impeachment evidence violate *Brady*. In *Giglio*, the government failed to disclose its plea agreement with the only witness linking defendant with the crime. 405 U.S. at 151, 92 S.Ct. at 764–65. Because that witness' credibility was "an important issue in the case, and any understanding or agreement as to a future prosecution ... [was] relevant to his credibility," failure to disclose such an agreement violated *Brady*. *Giglio*, 405 U.S. at 155, 92 S.Ct. at 766. *See also Davis*, 415 U.S. at 317, 94 S.Ct. at 1111 (credibility of prosecuting witness was a key element in state's case); *Talamante v. Romero*, 620 F.2d 784, 787 (10th Cir.) (where government's case rested entirely on eyewitness identification, failure to disclose police investigation of suspect resembling defendant violated *Brady)*, *cert. denied*, 449 U.S. 877, 101 S.Ct. 223, 66 L.Ed.2d 99 (1980).

Conversely, where a witness' credibility is not material to the question of guilt, failure to disclose impeachment evidence does not violate *Brady*. In *United States v. Bonnett*, 877 F.2d 1450, 1459 (10th Cir. 1989), we held that the government's failure to disclose that the author of a letter admitted into evidence was under indictment did not violate *Brady* where the content of the letter was "legally irrelevant" to defendant's guilt; hence the author's credibility was immaterial. In cases where the withheld impeachment evidence is merely cumulative, we have similarly declined to find a *Brady* violation. *See United States v. Page*, 808 F.2d 723, 730 (10th Cir.) (where jury already knew that government's principal witness had been arrested several times, failure to disclose additional arrest did not violate *Brady* ), *cert. denied*, 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987); *United States v. Haskins*, 737 F.2d 844, 852 (10th Cir.1984) (failure to disclose government assistance to witnesses in ob-

taining prison transfer was only cumulative impeachment). Moreover, where a prosecuting witness is not key to the government's case, his credibility is not material; hence the failure to reveal impeachment evidence concerning a minor witness does not violate *Brady. See Warhop,* 732 F.2d at 778–79 (credibility of coconspirator immaterial to defendant's guilt where focal point of government's case is conspiracy between defendant and other charged parties). Thus, while impeachment evidence falls under the general *Brady* rule requiring disclosure of exculpatory evidence, it is subject to the same standard of materiality as other forms of exculpatory evidence.

## VI.

In order to determine whether evidence of the Tilley–Whitten relationship is material under *Brady,* we must evaluate (1) whether the credibility of either Whitten or Tilley was determinative of Buchanan's guilt or innocence, and (2) whether nondisclosure of the Tilley–Whitten relationship raised a reasonable doubt to Buchanan's guilt that did not otherwise exist. We thus examine Tilley and Whitten's respective testimony in the context of the entire record.

■ Agent Tilley testified that the firebomb used to destroy Huffman's trailer constituted a firearm under federal law and that Buchanan had no registration for such firearm. This testimony admits of little impeachment. Tilley's testimony was based on objective and readily-confirmable criteria involving straightforward technical and legal definitions.[4] Therefore, cross-examination concerning Tilley's relationship with Whitten to elicit Tilley's bias would

have had no legal bearing on Buchanan's guilt.

■ In contrast, Whitten's testimony was admitted to show Buchanan's motive for conspiring to burn Huffman's trailer. Evidence that Whitten was romantically involved with Tilley is relevant toward proving her bias against Buchanan and in favor of the government. Moreover, unlike that of agent Tilley, Whitten's testimony was not based on objective and readily-confirmable criteria. Because Whitten's credibility could have been impeached by cross-examining her about her relationship with agent Tilley, we must evaluate the effect of her testimony in establishing Buchanan's guilt.

■ Buchanan was charged with the manufacture and possession of an unregistered firearm and conspiracy. The testimony of Elrod, Omstead and Bunch established that Buchanan directed the manufacture and delivery of an unregistered firearm, a violation of 26 U.S.C. § 5861.[5] Testimony revealed that on four occasions Buchanan affirmed the existence of the agreement to burn Huffman's trailer, a conspiracy under 18 U.S.C. § 371. The testimony of Elrod, Omstead and Bunch established a violation of 26 U.S.C. § 5861 and conspiracy independently from the testimony of Whitten.[6] Whitten's *credibility* therefore had only the most attenuated bearing on the question of Buchanan's guilt; she was not a key witness to the government's case. *See Bonnett,* 877 F.2d at 1459; *Warhop,* 732 F.2d at 778–79.

Had the government withheld non-cumulative evidence impeaching Elrod, a different holding might prevail. Elrod was the linchpin connecting Buchanan to the firebombing of Huffman's home. However,

---

**4.** Tilley's competence to testify concerning legal definitions involving a firearm was affirmed on direct appeal. *Buchanan,* 787 F.2d at 483–84.

**5.** Where a person is more than a mere participant in a transaction and has control over and is able to assure delivery, he need not be in actual possession to "possess" a firearm in violation of 26 U.S.C. § 5861. *United States v. Hawke,* 505 F.2d 817, 823 (10th Cir.1974), *cert. denied,* 420 U.S. 978, 95 S.Ct. 1404, 43 L.Ed.2d 658 (1975). Bunch's testimony established that

Buchanan anticipated the use of a destructive device in burning Huffman's trailer so as to support a violation of § 5861. *See Buchanan,* 787 F.2d at 487–88.

**6.** A person commits a conspiracy to manufacture a firearm when he hires someone else to manufacture an unregistered firearm. *See United States v. Parker,* 469 F.2d 884, 894 (10th Cir.1972) (hiring two felons to manufacture molotov cocktails constitutes conspiracy to manufacturer unregistered firearms).

Elrod was subjected to extensive cross-examination and his credibility was called into question on numerous occasions. The jury's decision to find Elrod and Omstead more credible witnesses than Buchanan therefore will not be disturbed. *See Cabana v. Bullock*, 474 U.S. 376, 388 n. 5, 106 S.Ct. 689, 698, n. 5, 88 L.Ed.2d 704 (1986) (credibility determinations cannot be made by appellate court on basis of paper record). Our *Brady* inquiry ends with our determination that the jury in this case had sufficient information to make a credibility finding on the prosecution's key witnesses. Having been afforded such information, the jury performed its required task; its verdict should not be second-guessed.

In holding that the government's failure to disclose the Tilley–Whitten relationship did not violate *Brady,* we recognize that the sensational nature of this evidence might have affected the verdict. The dramatic effect of exposing a personal relationship between a witness and the government's investigator seated at counsel table throughout the trial cannot be gainsaid. A jury cognizant of this relationship might have ignored admonitions that it was only relevant to Whitten's credibility and, out of sympathy or disdain, returned a verdict of not guilty. However, *Brady* does not elevate such sporting theories of justice to constitutional principles. The withheld evidence of the Tilley–Whitten relationship is not material under *Brady* because, as a matter of law, it does not raise a reasonable doubt as to Buchanan's guilt that did not otherwise exist. We therefore hold that the district court erred in its ruling that Buchanan constitutionally is entitled to a new trial.

Our holding should not signify approval of the government's conduct in this matter. Agent Tilley's conduct, in failing to disclose his relationship with Whitten, appears highly unprofessional. Although, under the unique facts of this case, Tilley's failure to disclose did not result in a *Brady* violation, our concern remains that the criminal justice system remain free from impropriety in both fact and appearance.

Because we hold that the district court erred in granting Buchanan a new trial, we need not address Buchanan's cross-appeal that the district court should have set aside his conviction.

REVERSED.