**UNITED STATES of America, Plaintiff–Respondent,**

v.

**William R. KENNEDY, Defendant–Petitioner.**

**No. CIV. A. 97–B–816, CR. A. 92–CR–227–B.**

United States District Court, D. Colorado.

Nov. 2, 1998.

Stacey Ross Goh, Charlotte J. Mapes, Assistant United States Attorneys, Denver, CO, for Plaintiff–Respondent.

James Rouse, Englewood, Craig L. Parshall, Fredricksburg, VA, for Defendant–Petitioner.

MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendant–Petitioner, William R. Kennedy, petitions to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (1997). Plaintiff–Respondent, United States of America ("the government"), objects to the petition on procedural and substantive grounds. The petition is adequately briefed and oral argument would not materially aid its resolution. Applying the relevant legal standards, I hold that, with the exception of Mr. Kennedy's claims for ineffective assistance of counsel and intrusion into his attorney-client relationship, Mr. Kennedy's claims are procedurally barred pursuant to *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Because the petition, files, and records of the case conclusively show that Mr. Kennedy is entitled to no relief on his claims for ineffective assistance of counsel and intrusion into his attorney-client relationship, I deny his petition. Jurisdiction exists pursuant to 28 U.S.C. § 1331.

## I. PROCEDURAL HISTORY

On July 2, 1992, a federal grand jury returned two separate indictments. One indictment, bearing case number 92–CR–228–M (the "Kuwait case" or "Kuwait trial") (assigned to Chief Judge Richard P. Matsch), alleged that Defendant–Petitioner William R. Kennedy ("Mr.Kennedy"), along with Sam Zakhem ("Mr.Zakhem"), former United States Ambassador to Bahrain, and Scott Stanley ("Mr.Stanley"), a journalist from Washington D.C., conspired to defraud the United States Department of Treasury in connection with their alleged failure to report money received from agents of Kuwait.

Messrs. Kennedy, Zakhem, and Stanley allegedly received $7,700,000 from the Kuwaiti Ambassador to the United States and the Kuwaiti Emergency Finance Minister, which funds were to pay for an advertising campaign supporting the liberation of Kuwait, then occupied by Iraqi military forces.

The other indictment, bearing case number 92–CR–227–B (the "WMC case" or "WMC trial") (assigned to this Court), charged Mr. Kennedy and eighteen other defendants with one or more counts of racketeering, mail fraud, wire fraud, and/or money laundering in connection with their employment or association with Western Monetary Consultants, Inc. ("WMC"), the alleged racketeering enterprise. Mr. Kennedy was the President and owner of WMC. David Lane ("Mr.Lane") was Mr. Kennedy's court-appointed trial counsel in both the WMC case and the Kuwait case. The indictment in the WMC case charged Mr. Kennedy and nine other defendants with participating in a racketeering enterprise, mail fraud, wire fraud, and money laundering during the four-year time period from January 1, 1984 to March 28, 1988. Essentially, the indictment charged that those defendants operated a "Ponzi" scheme to defraud investors of their money and precious metals. The other defendants in the WMC case, primarily telemarketers, were each charged with multiple counts of mail and wire fraud.

WMC sold precious metals to the general public over the telephone and, beginning in 1984, at seminars conducted throughout the United States. The seminars consisted of sales presentations designed to convince clients that world events warranted precious metals purchases. WMC targeted wealthy, elderly people with conservative political and religious beliefs. WMC sold precious metals with the promise that the price would be "locked in" at or about the time of the sale, and that WMC would effect the purchase immediately. The government charged that, in fact, WMC diverted its clients' money to other undisclosed uses, in many instances delaying the purchase and, in other instances, failing to purchase the metal at all. The uses of diverted client money included, but were not limited to, payment of expenses necessary to run WMC, purchase of other business enterprises, payment of expenses necessary to run other business enterprises, personal use by Mr. Kennedy and his family, and the purchase, refurbishment, and transport of a helicopter for Nicaraguan "freedom fighters" in Central America.

In March 1988, Mr. Kennedy sent letters to some of WMC's customers, wherein he wrote that WMC's failure to fill client orders resulted from the business' inability to keep pace with its tremendously fast growth. During trial, the government presented evidence showing that unwise speculation and intentional diversion of client funds for unauthorized purposes caused WMC's inability to fill orders. On March 28, 1988, WMC petitioned for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Over 600 investors were listed as creditors with losses in excess of $18,000,000. When WMC filed its petition for bankruptcy, the market value of unfilled orders approximated $37,162,000.

I granted severance of trial in the WMC case. Trial for the WMC telemarketers was ordered to follow trial for Mr. Kennedy and the other racketeering defendants. *See United States v. Kennedy ("Kennedy I")*, 819 F.Supp. 1510, 1513 (D.Colo.) (resolving pretrial motions), *aff'd sub nom. United States v. Byron*, 994 F.2d 747 (10th Cir.1993). At trial, Mr. Kennedy did not testify on his own behalf. Mr. Lane, as Mr. Kennedy's trial counsel, presented evidence in an attempt to persuade the jury that Mr. Kennedy had no intent to defraud investors but, rather, mismanagement and other business factors led to WMC's inability to fill customer orders.

On September 20, 1993, after a seven-week trial in the WMC case, the jury convicted Mr. Kennedy of one count of racketeering in violation of 18 U.S.C. §§ 1962(c) & 1963, nine counts of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 2 & 1341, and seven counts of aiding and abetting money laundering in violation of 18 U.S.C. §§ 2 & 1956(a)(1)(A)(i). The other racketeering defendants tried with Mr. Kennedy were acquitted. In accordance with the applicable sentencing guidelines, I sentenced Mr. Ken-

nedy to 240 months in prison on January 5, 1994.

Mr. Kennedy, represented by different counsel, appealed his conviction in the WMC case on October 3, 1994. He argued that: (1) this Court abused its discretion by denying his requests for additional litigation and financial support, in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution and the Criminal Justice Act, 18 U.S.C. § 3006A; (2) eight of the mail fraud convictions derived from insufficient evidence; (3) all of the money laundering convictions derived from a legally inadequate indictment, improper jury instructions, and insufficient evidence; (4) this Court erred by excluding certain evidence at trial; and (5) Mr. Lane rendered ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution. In affirming the judgment of conviction, the Court of Appeals rejected Mr. Kennedy's first four arguments and declined to address Mr. Kennedy's ineffective assistance of counsel argument because its resolution required factual determinations beyond the scope of the record on direct review. *See, generally, United States v. Kennedy ("Kennedy II"),* 64 F.3d 1465, 1474–1475 (10th Cir.1995) (argued January 25, 1995; issued August 30, 1995).

The Kuwait case proceeded to trial during February and March 1995, but as to Mr. Zakhem only. After Mr. Zakhem's acquittal, the government moved for dismissal of all charges against Mr. Kennedy and Mr. Stanley.

Because his conviction in the WMC case became final before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996), Mr. Kennedy had until April 23, 1997 to file a § 2255 motion. *United States v. Simmonds,* 111 F.3d 737, 746 (10th Cir.1997). Mr. Kennedy filed this petition on April 22, 1997, asserting multiple claims that he categorizes variously as: (1) prosecutorial misconduct; (2) commission of error by this Court in allowing the prosecutor to read the contents of a prejudicial exhibit in the jury's presence, in violation of the Due Process Clause of the Fifth Amendment of the United States Constitution; (3) improper reference to Mr. Kennedy's religious activities during trial, in violation of the First and Fifth Amendments of the United States Constitution; and (4) ineffective assistance of trial counsel in violation of the Sixth Amendment of the United States Constitution.

## II. PETITIONER'S ALLEGATIONS

Mr. Kennedy presents a tangled web of interrelated claims. Before addressing the government's procedural and substantive challenges to his claims, I first identify each of Mr. Kennedy's specific contentions, thereby providing context for the analysis that follows.

### a. "Prosecutorial Misconduct"

Mr. Kennedy asserts five claims that he categorizes as "prosecutorial misconduct." He alleges that the prosecution: (1) intentionally, recklessly, or knowingly intruded into his attorney-client relationship in violation of the Fifth and Sixth Amendments of the United States Constitution; (2) failed to disclose exculpatory evidence as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) misrepresented material facts to Mr. Kennedy's trial counsel and the district court during the WMC case; (4) informally assured prosecutorial immunity to a grand jury witness; and (5) imposed an obligation of secrecy on a grand jury witness regarding the scope of the grand jury process. I discuss each allegation separately.

#### 1. *"Prosecutorial Misconduct:" Intrusion of Attorney–Client Relationship*

The majority of Mr. Kennedy's § 2255 claims derive from his relationship with Keith Danley ("Mr.Danley"), Mr. Kennedy's alleged attorney from May 1989 through December 1990 or January 1991. Mr. Danley graduated from California Western School of Law in 1989. Immediately thereafter, he worked as a law clerk or paralegal for Brown & McDonnell, a San Diego law firm that represented Mr. Kennedy in connection with various legal matters, including civil fraud suits relating to Mr. Kennedy's affiliation

with WMC. In his § 2255 affidavit, Mr. Kennedy alleges, *inter alia:*

(a) During 1989, Mr. Danley informed Mr. Kennedy that he had graduated from law school and was "waiting to pass the bar exam and be licensed as an attorney." (Kennedy Aff. ¶ 5, Pet'r Ex. 1.)

(b) Mr. Danley worked closely with John Romaker ("Mr.Romaker"), an attorney with Brown & McDonnell, on "all" civil cases brought against Mr. Kennedy for his involvement with WMC. (Aff. of Kennedy ¶¶ 5–8.)

(c) While at Brown & McDonnell, Mr. Danley worked closely with several other attorneys representing Mr. Kennedy on various matters, including WMC's Chapter 11 bankruptcy, Mr. Kennedy's personal bankruptcy, Mr. Kennedy's potential grand jury testimony, and Mr. Kennedy's anticipated criminal defense. Mr. Danley worked closely with Stephen Mayo, a California attorney retained by Mr. Kennedy to handle criminal matters. (Aff. of Kennedy ¶¶ 7–11; Calendar of Brown & McDonnell of 9/14/89, Pet'r Ex. 4; Billing Statements of Mayo, Pet'r Ex. 35; Memo. from Brown to File of 10/27/89, Pet'r Ex. 36.)

(d) Mr. Danley sat for the California bar exam during the Summer of 1990. Mr. Danley told Mr. Kennedy later that Summer that he had passed the exam. (Aff. of Kennedy ¶ 12, Pet'r Ex. 1.)

(e) Upon learning of Brown & McDonnell's demise, Mr. Kennedy offered to hire Mr. Danley as his in-house legal counsel during August 1990. Mr. Danley began working as in-house counsel during October 1990. Mr. Romaker also left Brown & McDonnell and began to work for Mr. Kennedy during October 1990 as "outside counsel." (Aff. of Kennedy ¶¶ 13, 23.)

(f) In October 1990, during his first week of working for Mr. Kennedy, Mr. Danley traveled to Washington D.C. to meet with Mr. Kennedy and Robert Korpi ("Mr.Korpi"), a creditor of WMC who became the chairman of a creditor's committee in the WMC bankruptcy case. Mr. Kennedy instructed Mr. Danley to meet with Mr. Korpi regarding a joint venture unrelated to WMC. (Aff. of Kennedy ¶¶ 15–16.)

(g) From October 1990 through December 1990, Mr. Kennedy introduced Mr. Danley to other people as his "lawyer." Mr. Danley never contradicted Mr. Kennedy's characterization. (Aff. of Kennedy ¶ 20; Aff. of Zakhem ¶¶ 3–4, Pet'r Ex. 24; Aff. of Stanley ¶¶ 3–4, Pet'r Ex. 25.)

(h) Sometime between December 1990 and January 1991, Mr. Danley informed Mr. Kennedy that had he had failed the bar exam. Mr. Danley also stated that he intended to sit for a future Pennsylvania bar exam. (Aff. of Kennedy ¶ 21.)

(i) Mr. Kennedy introduced Mr. Danley to several key political and financial leaders from Argentina. They traveled together to Argentina during the Spring of 1991. Although they were supposed to take a second trip together to Argentina in May 1991, Danley canceled "at the last minute." During the May 1991 trip, Mr. Kennedy was stopped by United States and foreign government agents and searched for contraband. Upon arriving in Argentina, Mr. Kennedy discovered that his business associates had received anonymous letters "spreading numerous lies about [Mr. Kennedy] . . . and WMC." Upon arriving back in the United States, Mr. Kennedy discovered that other "sabotage" letters had been circulated to his business contacts. (Aff. of Kennedy ¶¶ 23–26, Pet'r Ex. 1.) The "sabotage" letters began on May 21, 1998 and continued through July 12, 1991. (Aff. of Kennedy ¶ 27; Misc. Corresp., Pet'r Ex. 5.)

(j) Mr. Danley authored the "sabotage" letters. In support of this allegation, Mr. Kennedy contends that: (a) Mr. Danley was one of the few people who had access to much of the information in the "sabotage" letters; (b) after he suspected Mr. Danley, Mr. Kennedy purposefully leaked some information to Mr. Danley only, which information appeared in a subsequent "sabotage" letter; and (c) after June 25, 1991, Mr. Danley threatened to assist Mr. Kennedy's enemies, as evidenced by a series of memoranda. (Aff. of Kennedy ¶¶ 27–31.)

(k) Mr. Danley schemed to "destroy" Mr. Kennedy so that Mr. Danley could usurp Mr. Kennedy's Argentine business connections. (Pet'r Opening Brf. at 20.)

(*l*) Mr. Danley ceased working for Mr. Kennedy during June 1991; Mr. Romaker ceased working for Mr. Kennedy on April 11, 1991. (Aff. of Kennedy ¶¶ 22–23.)

Mr. Kennedy further alleges that Mr. Danley used his knowledge to assist the prosecution in both the WMC and Kuwait cases. Beginning in September 1991, Mr. Kennedy contends that Mr. Danley disclosed strategic information to A.J. Gehring, Special Agent with the Criminal Investigation Division of the Internal Revenue Service, and Steve Peters ("AUSA Peters"), the Assistant United States Attorney and lead prosecutor assigned to the WMC and Kuwait cases. (Pet'r Opening Brf. at 48–60 (citing, *inter alia,* Memo. of Telephone Conv. of 9/17/91, Pet'r Ex. 8).) The first meeting occurred on September 27, 1991 in Denver, Colorado. (Memo. 9/27/91 Interview, Pet'r Ex. 9.) Additional interviews occurred on the following dates: December 9, 17, 19, and 30, 1991; June 1 and 18, 1992; and January 4 and 17, 1994. (Misc. Memoranda of Interview, Pet'r Exs. 10–18.) Mr. Kennedy alleges that the prosecution also interviewed Mr. Danley during February 1992 and sometime during 1993, but such interviews are not memorialized in reports. (Aff. Kennedy ¶ 33.) In addition to disclosing confidential information verbally, Mr. Danley allegedly delivered documents to AUSA Peters. (Pet'r Opening Brf. at 62 (citing, *inter alia,* Memo. of 9/27/98 Interview at 4, Pet'r Ex. 9).) During these interviews, AUSA Peters inquired about the possible existence of an attorney-client relationship, (*e.g.,* Memo. of 8/27/98 Interview at 1, Pet'r Ex. 9), but Mr. Kennedy alleges that AUSA Peters intentionally, recklessly, or knowingly intruded into Mr. Kennedy's attorney-client relationships to learn about defense strategies, tactics, and information, which information AUSA Peters then allegedly used during the WMC trial to aid Mr. Kennedy's prosecution. Mr. Kennedy was convicted on September 20, 1993 and sentenced on January 5, 1994.

Several weeks after Mr. Kennedy's sentencing in the WMC case, Mr. Zakhem's trial counsel in the Kuwait case moved to suppress evidence the prosecution allegedly derived from Mr. Danley. Although Mr. Danley did not testify during the WMC trial, the prosecution endorsed him as a witness for the Kuwait trial. Mr. Zakhem's trial counsel argued that an attorney-client relationship existed between Mr. Kennedy and Mr. Danley, which relationship applied to Mr. Zakhem by virtue of his entering into "joint enterprise" with Mr. Kennedy to liberate Kuwait from Iraqi military forces. Chief Judge Matsch conducted a suppression hearing, at which Mr. Romaker testified. Although present during that hearing, Mr. Danley never testified. On June 27, 1994, Chief Judge Matsch ruled that Mr. Zakhem failed to prove the existence of an attorney-client relationship, noting as follows:

> The core of defendants' contention is that at a debriefing interview in September 1991, Keith Danley disclosed privileged information to Assistant United States Attorney Stephen Peters and FBI Agent A.J. Gehring; that these government representatives knew or should have known that Danley was violating the privilege and that the subsequent investigation was tainted by the exploitation of such improperly obtained information. The record does not support a finding of intentional invasion of an attorney-client privilege. There is confusion and uncertainty about the status and role of Danley in the events leading up to the indictment. The relationship among the defendants, several organizations and a lawyer, John L. Romaker, are not well defined by the evidence or the law. Accordingly, the motions must be denied.

(Ord. of 6/27/94, Govt. Ex. 4.) A copy of the order was mailed to Mr. Lane.

2. *"Prosecutorial Misconduct:" Failure to Disclose Exculpatory Information*

Mr. Kennedy also contends that the prosecutor failed to disclose exculpatory information as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Mr. Kennedy cites four types of information that the prosecution allegedly failed to disclose before the WMC trial:

(a) reports of prosecution interviews of Mr. Danley (Pet'r Opening Brf. at 67);

(b) report of a prosecution interview of Mr. Romaker conducted on September 27, 1991 (disclosed January 24, 1994) (Pet'r Opening Brf. at 69);

(c) the existence and loss of ten pages of notes compiled by Mr. Danley during October 1990 (disclosed on March 1, 1995 by Mr. Danley during his testimony in the Kuwait trial) (Pet'r Opening Brf. at 69–70); and

(d) the fact of Mr. Danley's decision to conduct legal research during October 1990 and before he worked directly for Mr. Kennedy, which research inquired whether the attorney-client privilege applied to Mr. Danley's relationship with Mr. Kennedy (disclosed on March 1, 1995 by Mr. Danley during his testimony in the Kuwait trial) (Pet'r Opening Brf. at 70).

3. *"Prosecutorial Misconduct:" Misrepresentation of Material Facts*

Mr. Kennedy also avers that AUSA Peters misrepresented certain facts on two occasions. First, Mr. Kennedy maintains that AUSA Peters told Mr. Lane that Mr. Danley had nothing to do with the WMC case. (Pet'r Opening Brf. at 72 (citing Aff. of Lane ¶¶ 4–6, Pet'r Ex. 23).) Second, Mr. Kennedy contends that AUSA Peters lied in open court during the WMC trial about his knowledge of the source money purportedly paid by Mr. Kennedy as a preferential payment to Mr. Korpi, chairman of a creditors' committee in the WMC bankruptcy case. (Pet'r Opening Brf. at 71–72.)

4. *"Prosecutorial Misconduct:" Assurance of Informal Immunity to Mr. Danley*

As his fourth "prosecutorial misconduct" claim, Mr. Kennedy contends that AUSA Peters gave an informal assurance of immunity, otherwise known as "pocket immunity," to Mr. Danley during December 1991 without following established statutory procedures for bestowing immunity to a prosecution witness. (Pet'r Opening Brf. at 73 (referencing Memo. of 12/30/91 at 1–2, Pet'r Ex. 13).)

5. *"Prosecutorial Misconduct:" Imposition of Obligation of Secrecy on a Grand Jury Witness*

Mr. Kennedy's last "prosecutorial misconduct" claim avers that AUSA Peters forced Mr. Romaker to remain silent regarding the grand jury proceedings to prevent Mr. Kennedy from learning about the scope of such proceedings. (Pet'r Opening Brf. at 75 (referencing Memo. of 11/4/91 at 1–2, Pet'r Ex. 18).)

**b. Commission of Error by the District Court in Allowing the Prosecutor to Read the Contents of a Prejudicial Exhibit in the Jury's Presence**

Mr. Kennedy alleges that the prosecution used privileged information derived from Mr. Danley to impeach Mr. Korpi, who testified as a character witness on behalf of Mr. Kennedy during the WMC trial. Mr. Korpi was a creditor of WMC who became the chairman of a creditor's committee in the WMC bankruptcy case. Although he invested and lost nearly $300,000, he testified during the WMC trial that Mr. Kennedy was "honest" and had "a high level of integrity." (WMC Trial Transcript at 4295, Pet'r Ex. 52.)

AUSA Peters attacked the credibility of Mr. Korpi on cross-examination by confronting him with a check made payable to Mr. Romaker, in the amount of $5,000.00, and bearing the notation "R. Korpi." The check was drafted against a trust account established by Brown & McDonnell in San Diego. AUSA Peters suggested that Mr. Romaker gave $5,000 to Mr. Korpi on Mr. Kennedy's behalf:

AUSA Peters: And as you come here today to tell the jury about William Kennedy, isn't it true, sir, that you have received a payment facilitated by Mr. Kennedy for $5,000? Isn't that right, Mr. Korpi?

Mr. Korpi: $5,000?

AUSA Peters: That's right, sir.

Mr. Korpi: I received $5,000?

AUSA Peters: That's right.

Mr. Korpi: From Kennedy?

AUSA Peters: That's my question.

Mr. Korpi: Ooh, I don't recall that.

AUSA Peters: Mr. Korpi, do you remember attending a briefing in Washington D.C., in approximately October of 1990?

Mr. Korpi: That's correct.

AUSA Peters: And you remember telling Mr. Kennedy at that time, sir, that you had helped him when he was in trouble and now you wanted help now that you were in trouble?

Mr. Korpi: No, I don't recall—I recall being there, but I don't recall that that was the reason for being there.

AUSA Peters: And do you recall, sir, a gentleman named John Romaker who was an attorney from San Diego?

Mr. Korpi: John Romaker. In that October 15 meeting or October—

AUSA Peters: Of 1990, sir; that's right?

Mr. Korpi: Do I recall John Romaker?

AUSA Peters: Yes, an attorney from San Diego who represented Mr. Kennedy's interests.

Mr. Korpi: I remember another attorney. I forgot his name. You may have it. Maybe you can help me out. There was another attorney that I met there, yeah. I forgot his name.

AUSA Peters: Well, do you think it might refresh your recollection, sir, to see a payment in the amount of $5,000 that bears the memorandum on the check "R. Korpi"?

Mr. Korpi: $5,000? What was it for?

AUSA Peters: I'm asking the questions.

Mr. Korpi: I can't remember. I don't remember it. I'm sorry. I don't remember it. I just don't remember it. He may have given me $5,000. I don't know. I don't know. I just truly don't remember it, if he did.

AUSA Peters: Mr. Korpi, my question is whether it might refresh your recollection to see the check I've asked you about.

Mr. Korpi: Oh, I suppose if I saw the check, but—look at my signature, see if its on there.

* * * * * *

AUSA Peters: Mr. Korpi, I show you a copy of what's been marked for use as plaintiff's Exhibit 1214. Do you have that before you?

Mr. Korpi: I have a check from a Brown McDonald International Holloway Company, San Diego, First California Bank, made out to John—oh, client trust fund. Okay.

AUSA Peters: Mr. Korpi—

Mr. Lane: Judge, I'm objecting at this point. I think I have to approach at this point. May we?

The Court: Well, the question wasn't responsive in the first place. What is the rule upon which you rely, Mr. Lane?

Mr. Lane: On previous rulings of this court as to what we can get into and what we can't get into, your Honor. I mean the source of various things.

The Court: Well, yeah, I think maybe you better come on up.

[At the bench:]

The Court: I think I understand the objection. What's the source of these funds, Mr. Peters?

AUSA Peters: I don't know for sure that the source of the funds, and I don't intend to ask about them; but I intend to ask whether this witness received a $5,000 payment and terminate.

The Court: From whom?

AUSA Peters: From a law firm Brown and McDonald.

Mr. Lane: Which is all part of the [Kuwait case] indictment.

The Court: I'm going to sustain the objection to that extent.

AUSA Peters: All I'm asking, your Honor, is that the check has a memo on it that says, "R. Korpi." If this refreshes his recollection about the payment, that's all the further I want to go.

The Court: To that extent—Mr. Lane, under 612, the writing will not come in evidence; and if it refreshes—you know, pin him down. If it refreshes his recollection, fine. If it does not, fine. But in terms of the document, it doesn't come in. It just refreshes his recollection.

AUSA Peters: Right.

Mr. Lane: Judge, the other thing we should clear up at a bench conference is Mr. Peters is leaving a hanging implication here that people only got two payments from the bankruptcy; and the big question then becomes, well, why was that. And this witness is prepared to give an answer as to why only two payments.

The Court: No. I'm not getting into that. Not at all. I mean it's—the—we've had—we've had substantial testimony consistently that creditors got one or two payments of 100, $200 and that's total. That's wholly consistent. That's cumulative. That doesn't go to any-

thing, and I'm not going to go further than that. Now get through this process under 612 and let's get on with this witness.

AUSA Peters: The offer is only under 607, and I understand the court's ruling. And that's all I intend to do. Thank you, your Honor.

The Court: All right.

[In open court:]

The Court: Mr. Korpi, I'm going to tell you once again, sir, please just listen to the lawyer's question and answer that question and nothing more.

AUSA Peters: Mr. Korpi, does the memorandum "R. Korpi" refresh your recollection as to whether you received a payment for $5,000?

Mr. Korpi: No, it doesn't.

(WMC Case Trial Transcript at 4321–4325, Pet'r Ex. 52.) Shortly thereafter, the following colloquy took place outside the presence of the jury:

Mr. Rapson: Your Honor, if it please the Court, during the examination of—or cross-examination of Mr. Korpi, the government made reference to Government Exhibit 1008, and I didn't have that exhibit at that time, and have only looked at it since then.

But the thrust I thought of what they were suggesting was that Government Exhibit 1008 indicated that there had been a payment from Mr. Kennedy to Mr. Korpi of $5,000. Now maybe that's not what the government intended, but this document itself is a check from somebody on the surface, at least, unrelated to Mr. Kennedy, Brown and McDonald, International Monetary, to another party on the surface at least unrelated to Mr. Korpi, somebody called John Rambler, attorney/client trust account, $5,000.

The Court: I am sorry to interrupt, Mr. Rapson. I think you mean 1214.

Mr. Rapson: You are correct, your Honor. When I said 1008, I was looking at the check number, but it's Plaintiff's Exhibit 1214, but I thought what the government was suggesting in some way it amounted to a $5,000 payment from Mr. Kennedy to Mr. Korpi, and at least on the face of it it appears to be something quite different.

I suspect that there is very good explanation that the government has, but in the absence of an explanation, I wonder if this jury might not be misled at this point as to what this document suggests.

The Court: I thought we covered that at the bench conference. The document was merely proffered by the government to see if it refreshed the witness' recollection under Rule 612 as to whether he had received a $5,000 payment from Mr. Kennedy.

The government, if my recollection is correct, had asked if Mr. Korpi had, and he testified that he had no recollection of it. After viewing the exhibit he testified that it did not refresh his recollection. And that was the end of the matter.

Mr. Chesler.

Mr. Chesler: It if please the court, your Honor, I am also concerned about what transpired, and for this reason, if I can articulate it to you. The question was first prefaced did you receive a $5,000 payment. The suggestion being that that's the reason he is testifying for Mr. Kennedy, because he got more than the rest of the creditors got, notwithstanding the fact that he was the chairman of the committee representing the creditors.

In order for that question to be asked, there must be a good faith belief that that is indeed what transpired. The exhibit, not intending to be offered apparently, is then proffered to refresh recollection, the person says it doesn't refresh my recollection, but the suggestion is there to the jury that this man was bought off in some way with $5,000. That's why he is here today and this is a put-up job.

I think that that can be cured in some way. I don't think it's irreparable. I don't think it was offered improperly. I need to hear that, too. But, nevertheless, the innuendo is as damning, and I think it needs some repair for that reason.

AUSA Peters: It needs no repair. The allegations in the companion indictment which we carefully stayed away from are that on the date of the check, number 1008, October 23rd, 1990, Mr. Kennedy, as the Court has heard in the Court conducted proceedings, that his check for sudden bankruptcy was in fact dead in the Southern District of California. It is alleged in the companion case that this account, the account entitled Brown McDonald, IMF, International Monetary, was an account that Defendant Kennedy controlled on that date. The question was asked in good faith. I object to any curative instruction.

The Court: Well I am satisfied that the question was asked in good faith. Beyond that the jury has been told and will be told again—I think the jury has been told just recently—that the questions of counsel are not evidence. That's why I make the instruction at the outset of the case.

AUSA Peters: Mr. Rapson's record as carefully crafted is also incomplete because the memorandum—and I asked Mr. Korpi about this specifically under terms of 612 over—says re Korpi. I want the record to show that.

Mr. Rapson: I wasn't suggesting there was some something wrong. I was just asking for an explanation for the government, and they may have all kinds of evidence that this in fact is a direct payment of $5,000 from Mr. Kennedy to Mr. Korpi.

I was just suggesting on the surface there is nothing to suggest that—and apparently government counsel is satisfied that there is enough basis there to ask the question—I guess I am satisfied I agree with Mr. Chesler, that this jury, I think, is walking away thinking that that document is really evidence of $5,000 payment.

The Court: The document was not admitted.

Mr. Rapson: I understand.

The Court: It's not an exhibit in the case. It's not evidence in the case. I have also told the jury unless the exhibit is admitted, it's not

evidence in the case. That's why I tell them these things. Mr. Sutton.

Mr. Sutton: Am I mistaken or wasn't there some—an inquiry immediately before the check, something to this effect: Didn't you meet with Mr. Kennedy and tell him that you—that you were there when he needed you, and now I need you, Bill, and that's why the $5,000.

AUSA Peters: Most certainly was.

The Court: That was the question.

Mr. Sutton: Okay.

The Court: Well he had no recollection of any payment. He had—frankly my recollection of the testimony was that he had no recollection that that was expressed by Mr. Kennedy at that time.

Mr. Sutton: Well is the government intending to introduce that?

The Court: No, it's not evidence in the case. I didn't let them get it in. It's just not evidence in the case.

Mr. Sutton: Okay.

The Court: Counsel's statements are not evidence in the case or questions I mean. I have told the jury that they can't infer from a question what the answer might be. I have told them that. Okay.

(WMC Case Trial Transcript at 4405–4409, Pet'r Ex. 52.)

It also bears noting that Mr. Danley testified as follows during the grand jury proceeding:

AUSA Peters: I see. I want to direct your attention, please, to about October 16, 1990. Did you have conversations on that day with a creditor of Western Monetary Consultants known as Robert Korpi?

Mr. Danley: Yes, I did.

AUSA Peters: Do you recall his name being spelled K-o-r-p-i?

Mr. Danley: That's correct.

AUSA Peters: And he had been at this client briefing; is that right?

Mr. Danley: The day before, yes.

AUSA Peters: And it's my understanding that Mr. Korpi—excuse me, Korpi—had fallen upon some hard times himself, is that right?

Mr. Danley: Yes.

AUSA Peters: And various of his businesses were in Chapter 7 bankruptcy; is that right?

Mr. Danley: He had just converted to a Chapter 7 bankruptcy.

AUSA Peters: And Mr. Korpi was looking for Mr. Kennedy to pay him some money to help him through this time; is that right?

Mr. Danley: Yes.

AUSA Peters: So there was no doubt in those conversations between Mr. Korpi, the creditor, and Mr. Kennedy that the money was Kuwaiti money; is that right?

Mr. Danley: No doubt, yes.

---

(Grand Jury Transcript of 1/10/92, Pet'r Ex. 39). Mr. Kennedy avers that this court's failure to give a curative instruction or prevent AUSA Peters from asking questions regarding the check during the WMC trial constitutes a violation of the Due Process Clause of the Fifth Amendment of the United States Constitution.

**c. Reference to Petitioner's Religious Beliefs and Activities**

Mr. Kennedy also claims that the prosecution unfairly emphasized his religious beliefs during the grand jury process and the WMC trial. During the WMC trial, Joanne Monath, a former WMC employee, testified that WMC targeted people with conservative political and religious beliefs as likely to be interested in precious metal investments. (Pet'r Opening Brf. at 82 (citing WMC Trial Transcript at 1100, 1135, Pet'r Ex. 52).) Thereafter, other witnesses described how Mr. Kennedy carried a Bible and concluded some meetings with prayer. (Pet'r Opening Brf. at 82 (citing WMC Trial Transcript at 1302)). AUSA Peters queried an expert witness regarding the utility of injecting religion into WMC seminars and discussed Mr. Kennedy's use of religion during closing argument. (Pet'r Opening Brf. at 82 (citing WMC Trial Transcript at 4740, 128).) Mr. Kennedy contends that the elicitation of that testimony and comments during closing argument violates the Free Exercise Clause of the First Amendment and the Due Process Clause of the Fifth Amendment of the United States Constitution.

**d. Ineffective Assistance of Counsel**

Lastly, Mr. Kennedy contends that his trial counsel, Mr. Lane, rendered ineffective assistance of counsel during the WMC trial. Mr. Kennedy argues that, if the prosecution did not violate *Brady* by failing to disclose exculpatory information, then Mr. Lane rendered ineffective assistance of counsel by failing to move for the suppression of information derived from Mr. Danley.

## III. PROCEDURAL BAR

The government argues that, with the exception of his ineffective assistance of counsel claim, Mr. Kennedy's claims are procedurally barred because he failed to raise those arguments on direct appeal. I agree, in part. For the reasons set forth below, only two claims are not procedurally barred: ineffective assistance of counsel and intrusion into the attorney-client relationship.

**a. Procedural Bar Standards**

Section 2255 states, in relevant part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, ... or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.
>
> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that ... the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to

render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

A court may entertain and determine such motion without requiring the production of the prisoner at the hearing. An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

28 U.S.C. § 2255 (1997). Section 2255 does not afford petitioners a means of testing the legality of matters that should have been raised on direct appeal. *United States v. Cook,* 997 F.2d 1312, 1320 (10th Cir.1993); *Daniels v. United States,* 26 F.3d 706, 711 (7th Cir.1994) (A motion brought pursuant to § 2255 "is neither a recapitulation of nor a substitute for a direct appeal.") A petitioner's failure to present an issue on direct appeal bars him from raising the issue in his § 2255 motion unless he can show cause excusing his procedural default and "actual prejudice" resulting from the errors of which he complains, or that a fundamental miscarriage of justice will occur if his claim is not addressed. *Frady,* 456 U.S. at 167–168, 102 S.Ct. 1584; *Cook,* 997 F.2d at 1320.

 To show "cause" excusing procedural default, the petitioner must demonstrate that an external objective factor impeded his ability to directly appeal. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). For example, "showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable, would constitute cause under this standard." *Id.* (internal quotation and citations omitted). Ineffective assistance of counsel in violation of the Sixth Amendment may constitute an excusable "cause" of procedural default. *Id.* Further, and as noted by the Court of Appeals in *Kennedy II,* a petitioner may wait to raise his ineffective assistance of counsel claim in a § 2255 motion if the petitioner's claim requires examination of facts outside trial record. *United States v. Galloway,* 56 F.3d 1239, 1240 (10th Cir.1995). Lastly, the issuance of an intervening decision by the Supreme Court, which applies retroactively and changes the interpretation of the statute under which the petitioner was convicted, may establish "cause." *Abreu v. United States,* 911 F.Supp. 203, 207 (E.D.Va.1996). When assessing whether a party has established cause, the court may examine only that party's proffered reasons for not appealing and may not speculate about other possible explanations. *Williams v. United States,* 805 F.2d 1301, 1304 (7th Cir.1986). To show "actual prejudice" excusing procedural default, the petitioner must demonstrate that he was denied "fundamental fairness," *Murray,* 477 U.S. at 494, 106 S.Ct. 2639, or that, but for the error, he "might not have been convicted." *Reed v. Ross,* 468 U.S. 1, 12, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984).

The "miscarriage of justice" exception to the cause and prejudice test is narrow. Only "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, [may] a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray,* 477 U.S. at 496, 106 S.Ct. 2639. The fundamental miscarriage of justice exception is reserved solely for those with a "colorable showing of factual innocence." *Kuhlmann v. Wilson,* 477 U.S. 436, 454, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). In deciding whether this narrow exception applies in a particular case, the court is guided by the "prototypical example" in which "the State has convicted the wrong person of the crime." *Sawyer v. Whitley,* 505 U.S. 333, 340–341, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Application of this exception is limited to the "extraordinary case." *Schlup v. Delo,* 513 U.S. 298, 321 & n. 36, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

 Mr. Kennedy first contends that his claims are not procedurally barred because the alleged collective errors occurring before and during his trial constitute a fundamental miscarriage of justice under *Frady, supra.* Mr. Kennedy combines undisputed evidence, disputed evidence, reasonable inferences, unreasonable inferences, and conjecture in a complex argument in support of his inno-

cence. Essentially, he contends that the prosecution's alleged intrusion into his attorney-client relationship, failure to disclose exculpatory information, misrepresentations, interjection of religion during trial, cross-examination of Mr. Korpi, imposition of secrecy on Mr. Romaker, and informal assurance of prosecutorial immunity for Mr. Danley, all combine to demonstrate his factual innocence. I am unpersuaded.

As noted above, the "miscarriage of justice" exception to the cause and prejudice test is extremely narrow. Assuming the truth of Mr. Kennedy's contentions, he arguably was deprived of Fifth and Sixth Amendment rights. Yet such contentions, even assuming their truth, do not demonstrate Mr. Kennedy's factual innocence. He provides no such evidence bearing on the elements of the crimes of racketeering, mail fraud, or money laundering.

Mr. Kennedy compares his case to *Medina v. Barnes,* 71 F.3d 363 (10th Cir.1995). In *Medina,* the Court of Appeals found the petitioner satisfied the miscarriage of justice standard. Noting that the government's case was not strong to begin with, the Court of Appeals determined that the petitioner's trial counsel failed to investigate the testimony of the prosecution's only eyewitness to the crime of murder. During trial, the eyewitness lied about several material issues, including his extensive criminal background, his prior dealings and contacts with the victim, and how soon he called the police after the shooting. *Medina* at 371. The allegations left the Court of Appeals with the "distinct impression" of the petitioner's innocence. *Medina* at 371. Indeed, the Court of Appeals suggested that the eyewitness may have committed the murder. *Id.*

Mr. Kennedy's case clearly does not rise to the level of *Medina* . The WMC trial lasted approximately seven weeks and, unlike the situation presented in *Medina,* numerous prosecution witnesses testified against Mr. Kennedy, some of whom were co-conspirators who worked for WMC. Further, although Mr. Kennedy was the only defendant convicted in the WMC case, substantial evidence pointed to him as the orchestrator of WMC affairs. Thus, the acquittal of his co-defendants does not, by itself, demonstrate that the government's case against Mr. Kennedy was weak. Moreover, and unlike the petitioner in *Medina,* Mr. Kennedy fails to present in his petition any evidence showing his factual innocence. After reading *Medina,* it is understandable why the Court of Appeals was left with the impression that the wrong man may have been convicted. Upon review of Mr. Kennedy's allegations, and having heard the evidence at his trial, I am left with no impression that he is factually innocent. I find, therefore, that this is not the "extraordinary case" that fits into the narrow exception to the cause plus prejudice test. I turn, then, to Mr. Kennedy's remaining defenses to application of the procedural bar.

1. *"Prosecutorial Misconduct"*

As described above, Mr. Kennedy categorizes five different claims as "prosecutorial misconduct." Despite his argument that the same analysis applies to each claim, whether those five claims are procedurally barred is a question best resolved on a claim-by-claim basis. *Cf. Galloway,* 56 F.3d at 1241 (describing ineffective assistance of counsel claim as "unitary" for purposes of collateral review). Accordingly, I discuss each of his five "prosecutorial misconduct" claims separately regarding the procedural bar issue.

i. "Prosecutorial Misconduct:" Intrusion into the Petitioner's Attorney–Client Relationship

Mr. Kennedy contends that his failure to argue, on direct appeal, unlawful intrusion into his attorney-client relationship should be excused for the reasons enunciated by the Court of Appeals in *Kennedy II, supra.* In *Kennedy II,* the Court of Appeals instructed:

> Based on this court's reasoning in *United States v. Galloway,* we hold that Kennedy's ineffectiveness claim should be brought on collateral review. 56 F.3d 1239, 1240 (10th Cir.1995) (en banc) ("Ineffectiveness claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed.") While we noted in *Galloway* that "in rare instances an ineffectiveness of counsel claim may need

no further development prior to review on direct appeal," *id.*, this is not one of those exceptional cases. The bulk of Kennedy's arguments concerning his counsel's performance require precisely the type of factual determinations contemplated by *Galloway* as beyond the scope of the record on direct review—*e.g.*, assessments of what counsel did and did not do to prepare for trial, what he would or would not have found had he spent more time on various tasks, and whether the "mishandled" expert examination could be attributed to a fickle witness or an intentional trial strategy. Because any aspects of Kennedy's argument that already may be developed in the record are inextricably intertwined with other aspects of his argument, it is far more efficient to address the ineffectiveness claim in its entirety with the benefit of a full record before a district court on collateral review. *See id.* at 1241 ("[A]n ineffectiveness claim may be viewed as unitary, regardless of the number of separate reasons advanced in support of the claim. A unitary claim by definition cannot easily be split into two proceedings on any logical basis."). Accordingly, we dismiss Kennedy's claim of ineffective assistance of counsel without prejudice to Kennedy's right to raise it again in a collateral proceeding.

*Kennedy II*, 64 F.3d at 1474–1475. *Galloway*, in turn, cites *Beaulieu v. United States*, 930 F.2d 805 (10th Cir.1991). *Galloway*, 56 F.3d at 1240–1241. In *Beaulieu*, the Court of Appeals first held that ineffective assistance of counsel claims must normally be raised on collateral review. *Beaulieu* at 807. The Court of Appeals also noted that " 'collateral review will frequently be the only means through which an accused can effectuate the right to counsel ....' " *Id.* (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)).

■ Although the Court of Appeals has never applied this rationale to a claim of intrusion into the attorney-client relationship, reason dictates that the same analysis should apply to both claims. Each invokes the petitioner's Sixth Amendment right to effective assistance of trial counsel. Further, each claim usually requires consideration of matters not contained in the record on direct appeal. A claim of ineffective assistance of counsel involves assessments of how counsel prepared for trial, what counsel would or would not have found had he or she spent more time on various tasks, and whether counsel's decisions could be attributed to intentional trial strategy. *Kennedy II, supra.* Likewise, an intrusion claim requires assessments of whether an intrusion occurred, the prosecutor's state of mind, the extent of the intrusion, and the extent of prejudice incurred by the defendant. Because an intrusion claim requires precisely the type of determinations contemplated by *Galloway* and *Beaulieu*, it should normally be raised on collateral review where, as here, a substantial amount of evidence identified by the petitioner is not contained in the trial record. Accordingly, Mr. Kennedy's claim for intrusion of his attorney-client relationship is not procedurally barred and I need not consider his arguments in support of cause and prejudice regarding this claim. *See also United States v. Lee*, 1998 WL 45005, *3 (D.Kan.1998) (unpublished opinion) (extending rationale of *Galloway* to claim of involuntary plea).

ii. "Prosecutorial Misconduct:" Discovery Violations

As to his claim that the prosecutor failed to disclose to Mr. Kennedy exculpatory evidence, as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Mr. Kennedy cites four types of information not disclosed regarding Mr. Danley or Mr. Romaker that the prosecution allegedly failed to disclose before the WMC trial:

(a) reports of prosecution interviews of Mr. Danley;

(b) report of a prosecution interview of Mr. Romaker conducted on September 27, 1991;

(c) the loss of ten pages of notes compiled by Mr. Danley during October 1990; and

(d) the fact of Mr. Danley's decision to conduct legal research during October 1990 and before he worked directly for Mr. Kennedy, which research inquired whether the attorney-client privilege applied to Mr. Danley's relationship with Mr. Kennedy.

Mr. Kennedy contends that this information was not disclosed until the Kuwait trial commenced during March 1995, at least one month after the Court of Appeals heard oral argument on his direct appeal of the WMC case. The government has not demonstrated otherwise. Accordingly, Mr. Kennedy establishes cause for failure to allege *Brady* violations on direct appeal.

Although Mr. Kennedy establishes cause with respect to such information, he fails to establish prejudice. Noting that "[t]here appears to be little or no difference in the operation of the materiality" (*Brady*) and "prejudice" (*Frady*) "tests," the Tenth Circuit Court of Appeals has held that the "materiality" inquiry provides the proper test for analyzing whether a petitioner's *Brady* claim is procedurally barred. *United States v. Hernandez,* 94 F.3d 606, 609–610 (10th Cir. 1996); *accord United States v. Buchanan,* 891 F.2d 1436, 1440–1445 (10th Cir.1989).

The essence of the *Brady* rule is that nondisclosure of material, exculpatory evidence violates a defendant's due process right to a fair trial. *See, e.g., United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ("The *Brady* rule is based on the requirement of due process.") (Blackmun, J.); *United States v. Robinson,* 39 F.3d 1115, 1118 (10th Cir.1994) (due process mandates disclosure); *United States v. Fleming,* 19 F.3d 1325, 1330 (10th Cir.1994) (same). I am cognizant that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *Accord Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("[T]he touchstone of due process analysis ... is the fairness of the trial, not the culpability of the prosecutor."). As a result, it is irrelevant for the materiality analysis " 'whether the nondisclosure was a result of negligence or design.' " *Buchanan,* 891 F.2d at 1442 (quoting *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)); *see also Brady,* 373 U.S. at 87, 83 S.Ct. 1194 (noting that suppression of material exculpatory evidence violates due process "irrespective of the good faith or bad faith of the prosecution"); *United States v. Pedraza,* 27 F.3d 1515, 1527 (10th Cir.1994) (same).

The United States Constitution, as interpreted by *Brady,* does not require the prosecution to divulge every possible shred of information that could conceivably benefit the defendant. *Moore v. Illinois,* 408 U.S. 786, 795, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."); *United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir.1988) ("The Government has no obligation to disclose possible theories of the defense to a defendant."). Due process only requires the disclosure of material, exculpatory evidence which, "if suppressed, would deprive the defendant of a fair trial." *Bagley,* 473 U.S. at 675, 105 S.Ct. 3375. Therefore, in order to establish a *Brady* violation, Mr. Kennedy bears the burden of establishing that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material. *United States v. Hughes,* 33 F.3d 1248, 1251 (10th Cir.1994). It is the third element that I must analyze in the context of determining whether Mr. Kennedy's *Brady* claim is procedurally barred. I assume, therefore, for the purposes of this specific analysis, that the prosecution suppressed the information in question and that such information was favorable to Mr. Kennedy.

The third element requires proof that the evidence was "material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." *Agurs,* 427 U.S. at 104, 96 S.Ct. 2392. The Supreme Court first addressed the materiality question in *Agurs,* establishing three different standards of materiality dependent upon "the specificity of the defendant's request and the conduct of the prosecutor." *Buchanan,* 891 F.2d at 1441. The *Agurs* framework, however, was rigid and difficult to apply, leading five members of the Supreme Court, through two

separate opinions, to adopt a single standard. *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (opinion of Blackmun, J.); *Id.* at 685, 105 S.Ct. 3375 (opinion of White, J.); *see also Bowen v. Maynard,* 799 F.2d 593, 603 (10th Cir.1986) (discussing the three standards of materiality under *Agurs* and noting that after *Bagley,* courts are to apply "a single test ... to all instances of nondisclosure, including specific request, general request and no request cases"). Under this standard, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375; *accord Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir.1994).

Under this more flexible, sliding scale approach to assessing the materiality *vel non* of the evidence in question, the specificity of the request is inversely related to the prosecution's disclosure obligation. As the specificity of the defendant's request increases, a lesser showing of materiality will suffice to establish a violation. Conversely, as the defendant's request becomes more general or even nonexistent, a greater showing of materiality is required to establish a *Brady* violation.

In making the materiality determination, "we view the suppressed evidence's significance in relation to the record as a whole," *Hughes,* 33 F.3d at 1252 (citing *United States v. Wolf,* 839 F.2d 1387, 1391 (10th Cir.), *cert. denied,* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988)), keeping in mind that "[w]hat might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." [*United States v.*] *Robinson,* 39 F.3d at 1119 (citing *Agurs,* 427 U.S. at 113, 96 S.Ct. 2392). We are also to consider "any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case ... in light of the totality of the circumstances." *Bagley,* 473 U.S. at 683, 105 S.Ct. 3375. We reiterate the question of "[w]hether the government was required to disclose certain evidence under *Brady* is a mixed question of law and fact which we review *de novo.*"

*Smith v. Secretary of New Mexico Dept. of Corrections,* 50 F.3d 801, 827 (10th Cir.1995). Applying these principles to the facts of the present case, I conclude that the allegedly undisclosed information is immaterial.

Mr. Kennedy contends that the notes compiled by Mr. Danley and the prosecution team are material to his defense because the disclosure of such information could have enabled Mr. Lane to prevent the impeachment of Mr. Korpi. As to the allegedly lost or destroyed notes of Mr. Danley, Mr. Kennedy's assertion that Mr. Danley's notes would contain no mention of a payment to Mr. Korpi in October 1990 is pure conjecture. "The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." *United States v. Fleming,* 19 F.3d 1325, 1331 (10th Cir.1994).

As for the notes of meetings compiled by the prosecution that were not lost or destroyed, Mr. Kennedy has not shown how they could have been useful to Mr. Lane. As evidenced by the above-quoted portions of the WMC trial, AUSA Peters' attempt to impeach Mr. Korpi was unsuccessful. Mr. Korpi denied receiving any preferential payment from Mr. Kennedy, which testimony is uncontroverted. Further, a copy of the check was never admitted as evidence. Although Mr. Kennedy contends that the government's disclosure of its loss of Mr. Danley's notes would have enabled Mr. Lane to rehabilitate Mr. Korpi, Mr. Korpi required no rehabilitation. The proof sought by AUSA Peters was absent when Mr. Korpi denied receiving a preferential payment, and I permitted AUSA Peters to go no further in his impeachment attempt. Moreover, this allegedly undisclosed evidence is insignificant considering the record as a whole.

Even if the notes allegedly compiled by Mr. Danley and the prosecution were disclosed to Mr. Lane, and even if such notes would not have contained any reference to a preferential payment for Mr. Korpi, Mr. Lane's use of such notes during re-direct would have only emphasized the point AUSA Peters failed to make. Further, had Mr.

Lane called Mr. Danley as a witness to testify that no payment was made to Mr. Korpi, AUSA Peters could have impeached Mr. Danley with his grand jury testimony, also quoted above. Accordingly, the usefulness of such information to the defense is *de minimis* at best.

As for the prosecution's alleged failure to disclose the fact of Mr. Danley's decision to conduct legal research inquiring whether the attorney-client privilege applied to Mr. Danley's relationship with Mr. Kennedy (type (d)), I question whether this alleged fact constitutes information subject to disclosure. In any case, I fail to see the value of such information if known by Mr. Lane. Mr. Lane could not have used such information to impeach Mr. Danley, because Mr. Danley never testified during the WMC trial. Further, even if the disclosure of such information would have led to the suppression of the check used by AUSA Peters during his attempt to impeach Mr. Korpi, I find that AUSA Peters' cross-examination was ineffective. Lastly, the only piece of evidence that Mr. Kennedy can point to as emanating from the alleged intrusion is the check used by AUSA Peters, which check was not admitted into evidence. Applying the *Bagley* standard to my close examination of the record, I conclude that there exists no reasonable probability that disclosure of the cited evidence would have produced a different verdict. Because the allegedly undisclosed information is immaterial, Mr. Kennedy's *Brady* claim is procedurally barred.

iii. "Prosecutorial Misconduct:" Misrepresentation of Material Facts

Mr. Kennedy avers that AUSA Peters misrepresented certain facts on two occasions. First, Mr. Kennedy maintains that AUSA Peters told Mr. Lane that Mr. Danley had nothing to do with the WMC case. Second, Mr. Kennedy contends that AUSA Peters lied in open court during the WMC trial about his knowledge of the source money purportedly paid by Mr. Kennedy as a preferential payment to Mr. Korpi, chairman of a creditors' committee in the WMC bankruptcy case. For all practical purposes, the non-*Brady* aspects of these allegations are subsumed within Mr. Kennedy's intrusion claim. Mr. Kennedy contends that AUSA Peters made both misrepresentations to conceal his intrusion of Mr. Kennedy's attorney-client relationship. Accordingly, I will treat these allegations as subsumed within Mr. Kennedy's intrusion claim.

iv. "Prosecutorial Misconduct:" Informal Offer of Immunity to Mr. Danley and Imposition of Obligation of Secrecy on Mr. Romaker

Mr. Kennedy fails to show cause and prejudice for his failure to allege these claims on direct appeal. Even if he could demonstrate cause, he shows no prejudice. In *Giglio, supra*, the United States Supreme Court held that, when the credibility of a government witness is an important issue in a case, "evidence of any understanding or agreement as to a future prosecution is relevant to his credibility and the jury is entitled to know of it." *Giglio*, 405 U.S. at 154–155, 92 S.Ct. 763. Consequently, failure to disclose a promise made to a key government witness is material and violates the Due Process Clause of the Fifth Amendment. Because Mr. Danley did not testify at the WMC trial, the prosecution did not violate *Giglio* even if a grant of informal immunity existed.

Mr. Kennedy's allegation that the prosecution imposed silence on Mr. Romaker also lacks merit. First, the record fails to support Mr. Kennedy's allegation, premised on a memorandum that states, in relevant part:

> *On the above date AUSA Peters, Inspector Carr, and I telephoned Mr. Romaker.*
>
> * * * * * *
>
> [Mr. Romaker] advised that he is considering calling Mr. Lampson and letting him know of this phone call. However he does not know if at this time Mr. Lampson represents the aforementioned corporations. However he feels that he might be ethically obliged to let someone know. When asked if we agreed not to examine Mr. Hause regarding conversations with Mr. Romaker and the performance of accounting services for these three corporate entities would it be necessary for him to

contact Mr. Lampson regarding the subpoenas. Mr. Romaker at that time place [sic] us on hold to do research regarding the California rules of professional contact [sic].

After researching the matter Mr. Romaker returned to the phone and advised that he had no problem regarding the questioning as long as it would not touch on those matters. However he had a problem regarding any questions relating to the Coalition for America at Risk because he did some work for the Coalition for America at Risk and that time and there were some transactions relating to the Coalition for America at Risk and those three entities. Therefore Mr. Romaker asked that any discussion between himself and Mark Hause regarding the Coalition for America at Risk be added to the list of areas to be avoided to which AUSA Peters agreed.

At this time AUSA Peters agreed to fax a letter of agreement to Mr. Romaker outlining what had just been discussed and discontinued the phone conversation.

(Memorandum of Tel. Conv. of 11/4/91 at 1, 3, Def.'s Ex. 18.) The memorandum discloses nothing more than a mutual agreement. AUSA Peters agreed to curtail the scope of his inquiry in exchange for Mr. Romaker's promise to refrain from contacting an attorney representing Mr. Kennedy's interests. The memorandum demonstrates no unlawful coercion. Mr. Romaker, after researching California rules of ethical conduct, simply decided that the situation did not require him to contact Mr. Kennedy's attorney. Accordingly, Mr. Kennedy's allegation that the prosecution silenced Mr. Romaker lacks substantive merit.

Even if the prosecution had imposed secrecy on Mr. Romaker by coercion or otherwise, Mr. Kennedy fails to refer to any valid legal authority as prohibiting the imposition of secrecy on a grand jury witness. In support of his claim, Mr. Kennedy cites *United States v. Kilpatrick,* 594 F.Supp. 1324, 1335–1336 (D.Colo.1984). That decision, however, was reversed on appeal. *See United States v. Kilpatrick,* 821 F.2d 1456 (10th Cir.1987), *aff'd sub nom. Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). In *Bank of Nova Scotia,* the United States Supreme Court reviewed the district court's finding that the imposition of secrecy on a grand jury witness violates Federal Rule of Criminal Procedure 6. Neither the district court nor the Supreme Court suggested such conduct violates any constitutional provision or other rule of law. *Bank of Nova Scotia* at 262, 108 S.Ct. 2369. In *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), the Supreme Court held that, in the absence of any indication that the defendant was prejudiced by the asserted error, § 2255 collateral relief is not available for the failure to comply with the formal requirements of a rule of criminal procedure. *Accord United States v. Timmreck,* 441 U.S. 780, 783, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979) (violation of Fed. R.Crim.P. 11). Mr. Kennedy has shown no prejudice caused by this conduct. Nor does he identify a constitutional or jurisdictional basis for this claim and, therefore, this claim may not be brought on collateral review.

2. *Commission of Error by the District Court in Allowing the Prosecutor to Read the Contents of a Prejudicial Exhibit in the Jury's Presence*

Unlike his intrusion claim, Mr. Kennedy should have raised on direct appeal his allegation that this court erred in allowing the prosecutor to read the contents of a prejudicial exhibit in the jury's presence. As indicated by the excerpts from the WMC trial quoted above on page 13–17 of this order, AUSA Peters attacked the credibility of Mr. Korpi on cross-examination by confronting him with a check in the amount of $5,000.00 made payable to Mr. Romaker and bearing the notation "R. Korpi," a check that was drafted against a trust account established by Brown & McDonnell in San Diego. Mr. Kennedy's trial counsel objected to AUSA Peters' cross-examination. (WMC Trial Transcript at 4321–4323, Pet'r Ex. 52.) Counsel for Mr. Kennedy's co-defendants requested a curative instruction after the cross-examination. (WMC Trial Transcript at 4405–4409.) The nature of counsels' legal arguments demonstrates that the alleged prejudice was well known to all at the time of trial. Further, this claim requires no expan-

sion of the trial record and, therefore, should have been raised on direct appeal. This claim is procedurally barred for failure to show cause.

To the extent this claim is related to Mr. Kennedy's intrusion claim, however, it may survive the government's procedural objections. As part of his intrusion claim, Mr. Kennedy avers that AUSA Peters gained knowledge about the check and Mr. Korpi from Mr. Danley, in violation of Mr. Kennedy's attorney-client relationship. Further, Mr. Kennedy contends that such information should have been suppressed as "fruit of the poisonous tree." *See United States v. Kingston,* 971 F.2d 481, 491–492 & 492 n. 6 (10th Cir.1992) (breach of attorney-client privilege bars prosecution from presenting tainted evidence at trial) (citing *United States v. Blue,* 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966)). Thus, to the extent Mr. Kennedy contends that the evidence of the $5,000 check is derived from the alleged intrusion, that contention is not barred and remains viable, but only within the context of his intrusion claim.

3. *Reference to Petitioner's Religious Beliefs and Activities*

Mr. Kennedy's contention that the prosecution unfairly emphasized his religious beliefs during trial is procedurally barred. Mr. Kennedy does not argue cause and prejudice for failing to raise this issue. Lastly, this claim does not require expansion of the trial record for adjudication. Other criminal defendants have raised similar challenges on direct appeal. *See United States v. Meyers,* 95 F.3d 1475 (10th Cir.1996); *United States v. Sun Myung Moon,* 718 F.2d 1210 (2d Cir.1983); *United States v. Peister,* 631 F.2d 658 (10th Cir.1980).

Even if this claim were not procedurally barred, it lacks merit. The prosecution did not unfairly interject Mr. Kennedy's religious activities or beliefs into the WMC trial. Such evidence established only that WMC targeted individuals with conservative and political and religious beliefs. The evidence did not disparage Mr. Kennedy for having religious beliefs or his religious beliefs themselves. Rather, the evidence provided *modus operandi* context for the alleged crimes and, therefore, was admissible as *res gestae. See United States v. Kimball,* 73 F.3d 269, 272 (10th Cir.1995) (approving the admission of *res gestae* evidence); *United States v. Masters,* 622 F.2d 83, 86 (4th Cir. 1980) (evidence is admissible when it provides the context for the crime, is necessary to a full presentation of the case, or is appropriate in order to complete the story of the crime on trial by proving its immediate context).

## IV. NECESSITY OF AN EVIDENTIARY HEARING

"A prisoner who invokes § 2255 is not entitled to an evidentiary hearing as a matter of right." *David v. United States,* 134 F.3d 470, 477 (1st Cir.1998). The district court need not hold an evidentiary hearing on the petitioner's claims if "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *Galloway,* 56 F.3d at 1240 n. 1; *United States v. Lopez,* 100 F.3d 113, 119 (10th Cir.1996). In determining whether the petitioner has satisfied his burden of establishing the need for an evidentiary hearing, I must accept as true petitioner's factual averments, except to the extent such averments are contradicted by the record. *United States v. McGill,* 11 F.3d 223, 225 (1st Cir.1993); Rule 4 of the Rules Governing § 2255 Proceedings. I may disregard "conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets." *Id.*

### a. Ineffective Assistance of Counsel

Mr. Kennedy contends that, if the prosecution failed to disclose exculpatory information as required by *Brady,* then Mr. Lane rendered ineffective assistance by failing to move for the suppression of all evidence derived from Mr. Danley. In making this contingent claim, Mr. Kennedy assumes that Mr. Lane knew about information that would have compelled a reasonable attorney to move for suppression of the information derived from Mr. Danley. Although facially adequate, the petition, files, and record con-

clusively show that Mr. Kennedy is entitled to no relief and, therefore, resolution of his ineffective assistance of counsel claim does not require an evidentiary hearing.

To establish a claim for ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was constitutionally deficient, and (2) counsel's deficient performance was prejudicial. *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052. Counsel's performance is deficient if the representation "falls below an objective standard of reasonableness." *Id.* at 690, 104 S.Ct. 2052. Prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "There is a strong presumption that counsel provided effective assistance, and a section 2255 defendant has the burden of proof to overcome that presumption." *United States v. Williams,* 948 F.Supp. 956, 960 (D.Kan.1996) (citations omitted), *aff'd,* 118 F.3d 717 (10th Cir.1997).

Assuming, *arguendo,* that Mr. Lane knew about the information identified by Mr. Kennedy in his *Brady* claim, his failure to move for suppression did not fall below an objective standard of reasonableness. Again, I emphasize that Mr. Danley never testified during the WMC trial. Further, the prosecution never used the notes of interview during trial. The only specific information that Mr. Kennedy identifies as deriving from Mr. Danley and used by the prosecution during trial is the check used by AUSA Peters during his failed attempt to impeach Mr. Korpi. The check failed to refresh Mr. Korpi's recollection, the check was never admitted into evidence, Mr. Korpi denied receiving preferential payments from Mr. Kennedy, and the jury was instructed that the questions of counsel do not constitute evidence. I cannot conclude, under such circumstances, that Mr. Lane made a constitutional error by failing to move for the suppression of evidence derived from Mr. Danley. Nor can I conclude that his failure to do so prejudiced Mr. Kennedy's defense. Because the petition, files, and records of the case conclusively show that Mr. Kennedy is entitled to no relief, no evidentiary hearing is warranted as to this claim.

**b. Intrusion into Attorney–Client Relationship**

The government contends that Mr. Kennedy's claim for intrusion of his attorney-client relationship does not constitute a violation of the United States Constitution. I need not address this contention. Assuming, *arguendo,* that Mr. Kennedy's allegations state violations of the Sixth Amendment right to counsel and the Due Process Clause of the Fifth Amendment, his petition and the record of this case conclusively show that he is entitled to no relief. In *Shillinger II,* after finding an intentional and egregious intrusion into the attorney-client relationship by the prosecution, the Court of Appeals discussed the remedies available for an intrusion that violates the United States Constitution:

> Recognizing "the necessity for preserving society's interest in the administration of criminal justice," the [United States Supreme] Court enunciated the following standard: "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." [*United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).] The Court went on to describe how similar constitutional violations have generally been remedied:
>
>> [W]hen before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted ....
>>
>> Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial.

*Id.* at 365, 101 S.Ct. 665. The Court held that in light of this precedent, absent some prejudicial effect on the defendant's proceeding, "there is no basis for imposing a remedy in that proceeding." *Id.* Because the federal agents received no information from Morrison, and because they otherwise failed to affect her relationship with her attorney, the Court held that there was no basis for imposing a remedy in that case, "much less" dismissal of her indictment.

*Shillinger II,* 70 F.3d at 1142–1143. Thus, although "a prejudicial effect on the reliability of the trial process 'must be presumed'" when ascertaining whether a Sixth Amendment violation has occurred, the extent of prejudice is taken into consideration when determining an appropriate remedy for the violation.

 Here, accepting as true Mr. Kennedy's allegations except to the extent they are conclusory and contradicted by the record, he is not entitled to a new trial or dismissal of the indictment. As emphasized by the Supreme Court in *Morrison* and the Tenth Circuit Court of Appeals in *Shillinger II,* a new trial is appropriate only "if the evidence has been wrongfully admitted." Again, I return to the fact that Mr. Danley never testified during the WMC case. The notes compiled by Mr. Danley and the prosecution as a result of their meetings were never introduced as evidence. And again, the only evidence that Mr. Danley can identify as emanating from the alleged intrusion is the check used by AUSA Peters in his failed attempt to impeach Mr. Korpi. The check was never admitted into evidence. Under these circumstances, Mr. Kennedy is clearly not entitled to a new trial or dismissal of the indictment. The cases upon which Mr. Kennedy relies, in which the appellate or district court dismissed the indictment or ordered a new trial, are inapposite. Because the petition, files, and records of the case conclusively show that Mr. Kennedy is entitled to no relief on his intrusion claim, he has not satisfied his burden of showing the need for an evidentiary hearing.

## V. CONCLUSION

Mr. Kennedy combines undisputed evidence, disputed evidence, reasonable inferences, unreasonable inferences, and conjecture in a complex and cleverly drafted petition. When scrutinized, however, it is devoid of merit. First, most of his claims are procedurally barred. Although his claims for ineffective assistance of counsel and intrusion into his attorney-client relationship are not procedurally barred, the petition, files, and record of this case conclusively demonstrate that he is not entitled to § 2255 relief.

Accordingly, I ORDER that Defendant–Petitioner's motion to vacate, set aside, or correct his sentence pursuant to § 2255 is DENIED.